**Adam Clymer, Administrator of the Estate of Jane E. Clymer, Adam Clymer, Individually, and Ann F. Clymer v. Theron C. Webster, James N. Wesson, Deborah S. Wesson, Wesson's Diner, Inc., Alydia Garand, Beem, Inc., d/b/a The Rotisserie, and J. Duguay**

[596 A.2d 905]

No. 88-631

Present: Gibson, Dooley and Morse, JJ., and Barney, C.J. (Ret.) and Springer, D.J. (Ret.), Specially Assigned

Opinion Filed June 7, 1991

616

*William B. Gray* and *Peter H. Zamore* of *Sheehey Brue Gray & Furlong*, Burlington, for Plaintiffs-Appellants.

*Allan R. Keyes* and *John A. Serafino* of *Ryan Smith & Carbine, Ltd.*, Rutland, for Defendants-Appellees James Wesson and Alydia Garand.

*Frank E. Talbott, Bret P. Powell* and *Chris O'Brien* and *M. Cecilia Whelan*, Law Clerks (On the Brief), of *Wilson, Powell, Lang & Faris*, Burlington, for Defendants-Appellees Beem, Inc. and Joseph Duguay.

*Thomas J. Sherrer* of *Latham, Eastman, Schweyer & Tetzlaff*, Burlington, for Defendants-Appellees Deborah Wesson and Wesson's Diner, Inc.

**Gibson, J.** This appeal concerns the remedies available to the parents and the administrator of the estate of Jane Clymer, an adult decedent, in an action against two commercial vendors that served alcohol to a patron who thereafter drove his car and struck and killed the decedent. Plaintiffs Adam and Ann Clymer, parents of decedent, and Adam Clymer, as administrator of the estate of the decedent, appeal from a superior court order dismissing with prejudice their action against the owners and certain employees of two commercial vendors that served

alcohol to the man who drove the car that struck and killed their daughter. The dismissal of the suit was the culmination of a series of court orders construing the Dram Shop Act, the Wrongful Death Act, and the Survival Statute. We reverse and remand for further proceedings.

## I.

On September 14, 1985, after being served alcohol at The Rotisserie Restaurant and at Wesson's Diner, Theron Webster drove his car and struck Jane Clymer, an eighteen-year-old college student, while she was pushing her bicycle along the side of Route 116 in the town of Williston. Ms. Clymer suffered massive brain damage, but was kept alive until her parents arrived the next morning, when she was pronounced brain dead and allowed to expire. Theron Webster was charged with and pled guilty to DWI-death resulting.

In a complaint filed in July of 1986, plaintiffs alleged negligence against Theron Webster, and a Dram Shop Act violation against the commercial vendors and certain of the vendors' employees, seeking compensatory damages for medical and funeral expenses, emotional distress, loss of companionship, loss of future earnings, and loss of means of support. Plaintiffs also sought punitive damages against James Wesson, owner of Wesson's Diner, and Theron Webster; they later moved to amend their complaint to add a claim for punitive damages against The Rotisserie and one of its bartenders. Plaintiffs eventually settled with Theron Webster, and the court dismissed him from the action over the objections of the other defendants. After several rulings that limited the damages recoverable by plaintiffs "to medical and funeral expenses and lost services and guidance," the court dismissed the action with prejudice and entered judgment for the defendants on the ground that those damages did not exceed the $120,000 plaintiffs had already recovered from the negligent driver.

On appeal, plaintiffs argue that the trial court erred by denying their claims for (1) damages for deprivation of love, affection and society (loss of companionship) under the Dram Shop Act and the Wrongful Death Act; (2) damages for loss of future earnings under the Survival Statute; and (3) punitive damages under the Dram Shop Act and the Wrongful Death Act. Plain-

tiffs also contend that the cumulative effect of the court's rulings denied them an effective remedy for their injuries, as guaranteed by the Vermont Constitution. In their cross-appeal, defendants The Rotisserie and its bartender (J. Duguay) argue that (1) the trial court erred in dismissing Theron Webster; (2) the court should exclude expert evidence concerning what signs of intoxication would be exhibited by a person having a certain blood-alcohol level; (3) the Legislature has unconstitutionally delegated its authority to the Liquor Control Board; and (4) the Liquor Control Board regulation designating what constitutes an unlawful furnishing of alcohol is unconstitutionally vague.

## II.

 We first consider the relationship between the Dram Shop Act (DSA) and the Wrongful Death Act (WDA). As we have noted elsewhere, the Legislature enacted the DSA to create a statutory cause of action where none had previously been available under the common law. *Winney v. Ransom & Hastings, Inc.*, 149 Vt. 213, 215, 542 A.2d 269, 270 (1988); *Smith v. Wilcox*, 47 Vt. 537, 544 (1875). As it existed in 1985, the DSA provided:

> A . . . person who is injured in person, property or means of support by an intoxicated person, or in consequence of the intoxication of any person, shall have a right of action . . . against a person or persons, who, by selling or furnishing intoxicating liquor unlawfully, have caused in whole or in part such intoxication.

7 V.S.A. § 501.[1] The DSA further provides that "[u]pon the death of either party, the action and right of action shall survive to or against his executor or administrator." *Id.* The WDA (14 V.S.A. §§ 1491–1492), which predates the DSA, does not create

---

[1] The Legislature amended the Dram Shop Act in 1987. Among the changes, the Legislature deleted the word "unlawfully" and, instead, stated that persons liable under the act are those who furnish or sell intoxicating liquor to minors, to persons apparently under the influence of alcohol, to persons after legal-serving hours, and to persons who it would be reasonable to expect would be intoxicated as a result of the amount of alcohol already served them. 1987, No. 103, § 1. Aside from The Rotisserie defendants' unlawful-delegation and vagueness arguments in their cross-appeal, the amendment does not affect the issues addressed in this case.

a new cause of action, but rather a "'new right of recovery'" or "'new element of damages'" engrafted upon the already existing cause of action. See *Whitchurch v. Perry*, 137 Vt. 464, 469, 408 A.2d 627, 630 (1979) (quoting *Desautels' Adm'r v. Mercure's Estate*, 104 Vt. 211, 214, 158 A. 682, 683 (1932)). The WDA allows certain damages suffered by the next of kin of a person whose death resulted from the wrongful act, neglect or default of another and who would have been entitled to maintain an action had the victim survived.

Aside from out-of-pocket medical and funeral expenses, Jane Clymer's parents have not themselves been injured "in person, property or means of support" within the meaning of the DSA. Jane Clymer, however, was injured "in person" and would have been entitled to maintain an action under the DSA had she survived.[2] Therefore, we conclude that the administrator of Jane Clymer's estate has a cause of action pursuant to the DSA and that damages should be determined under the WDA.

Defendants point out that "Vermont's Dram Shop Act provides the exclusive remedy for cases falling within its scope, and preempts a cause of action in common law negligence." *Winney v. Ransom & Hastings, Inc.*, 149 Vt. at 216, 542 A.2d at 270. We recognize this limitation, but do not agree with defendants that it precludes an award of damages under the WDA in all cases brought pursuant to the DSA. As we have noted, Vermont's WDA "does not create a new cause of action but merely permits the recovery of additional damages in the cause of action" already available. *Whitchurch*, 137 Vt. at 469 n.3, 408 A.2d at 631 n.3.

We are mindful that the DSA is a strict liability statute, see *Langle v. Kurkul*, 146 Vt. 513, 516, 510 A.2d 1301, 1303 (1986), while wrongful death actions often involve negligent or intentional torts. See W. Keeton, Prosser and Keeton on the Law of Torts § 127, at 946 (5th ed. 1984). Indeed, some courts have

---

[2] Apparently, Jane Clymer was in a coma from the time she was struck by the car until her death the next day. Therefore, the administrator of the estate has, at best, a limited remedy under the DSA's survival provision. See *Thayer v. Herdt*, 155 Vt. 448, 454, 586 A.2d 1122, 1126 (1990) (under Vermont's Survival Statute, 14 V.S.A. §§ 1451–1453, administrator may collect damages only for those injuries sustained by a decedent *prior* to death); *Whitchurch v. Perry*, 137 Vt. 464, 469, 408 A.2d 627, 630 (1979) (same).

refused to allow the recovery of wrongful death damages in dram shop actions. See, e.g., *Robertson v. White*, 11 Ill. App. 2d 177, 185–86, 136 N.E.2d 550, 555 (1956) (citing differences in nature and purpose of dram shop act and wrongful death act, court refused to allow wrongful death damages in dram shop case where child was killed); *Beck v. Groe*, 245 Minn. 28, 35, 70 N.W.2d 886, 892 (1955) ("The wrongful death act and the civil damage act are wholly unrelated both as to scope and purpose."). More recent cases, however, have routinely considered wrongful death damages in actions brought under dram shop acts.[3] See, e.g., *Gionfriddo v. Gartenhaus Cafe*, 15 Conn. App. 392, 400–06, 546 A.2d 284, 287–92 (1988) (in action against dram shop, wrongful death damages not available against tavern only because they were the same as those collected against driver in prior wrongful death action), *aff'd*, 211 Conn. 67, 557 A.2d 540 (1989); *Fraternal Order of Eagles v. Illinois Casualty Co.*, 364 N.W.2d 218, 219, 222 (Iowa 1985) (decedent had been "injured in person," thereby allowing administrator of his estate to recover damages under dram shop act).

Moreover, wrongful death actions are not necessarily based on negligent acts. Some courts have allowed wrongful death damages in strict liability cases involving abnormally dangerous activities and defective products. W. Keeton, *supra*, § 127, at 946. The Vermont WDA provides a remedy when death is caused "by the wrongful act, neglect or default" of another; thus, it is not limited to acts of negligence. The acts that trigger dram shop liability clearly fit within the broad scope of the term "wrongful act." See *Bernier v. Raymark Industries*, 516 A.2d 534, 540 (Me. 1986) (under wrongful death statute, manufac-

---

[3] Several jurisdictions have permitted contribution between a dram shop and an intoxicated driver despite the lack of a common theory of liability between those defendants. See 6 M. Minzer, J. Nates, C. Kimball & D. Axelrod, Damages in Tort Actions § 49.31[2][b], at 49–88 to 49–92 (1991); see, e.g., *Ayers v. Straight*, 422 N.W.2d 643, 646-47 (Iowa 1988) (because dram shop and intoxicated driver share liability to injured party, right of contribution exists between them even though liability rests on separate grounds of strict liability and common-law negligence); see also 7 V.S.A. § 501(f) (1987 amendment to DSA explicitly provides, among other things, for contribution among responsible parties). It is an open question whether comparative negligence applies in dram shop cases. *Plante v. Johnson*, 152 Vt. 270, 273, 565 A.2d 1346, 1348 (1989).

turer commits "wrongful act" when it places defective or unreasonably dangerous product into stream of commerce; "wrongful act" need not result from neglect or fault).

In recent years, both the Iowa Supreme Court and the Rhode Island Supreme Court have held that the wrongful death of an individual constitutes "injury to person" under the DSA, allowing recovery thereunder. See *Fraternal Order of Eagles*, 364 N.W.2d at 222; *Beaupre v. Boulevard Billiard Club*, 510 A.2d 415, 416 (R.I. 1986). We agree with their approach. The DSA allows a person to recover damages for personal injuries that result from a vendor's improper conduct under the Act. It would be anomalous, indeed, to deny recovery to that person's personal representative solely because the injury was severe enough to cause the person's death when a lesser injury would have been compensable.

■ To sum up, we hold that Jane Clymer was "injured in person" within the meaning of the DSA. Because she would have been entitled to maintain an action under the DSA had she survived, her parents may recover damages available to them under the WDA. Further, because this Court has never recognized a common-law action for wrongful death, see *Thayer v. Herdt*, 155 Vt. 448, 453–54, 586 A.2d 1122, 1125 (1990); *State v. Oliver*, 151 Vt. 626, 629, 563 A.2d 1002, 1004 (1989), we must look to the WDA to determine what damages are available for an injury to the person when the decedent's personal representative brings an action under the DSA.

### III.

■■ The WDA allows the decedent's personal representative to recover "such damages as are just, with reference to the pecuniary injuries resulting from such death," on behalf of decedent's spouse and next of kin. 14 V.S.A. § 1492(b).[4] A 1976 amendment to § 1492(b) added a provision that "where the decedent is a minor child, the term pecuniary injuries shall also include the loss of love and companionship of the child and for

---

[4] The Survival Statutes, 14 V.S.A. §§ 1451–1453, allow a decedent's estate to recover for injuries sustained by the decedent prior to his or her death, see *Whitchurch v. Perry*, 137 Vt. at 469, 408 A.2d at 630; the decedent's death need not result from the injury, as with wrongful death actions.

destruction of the parent-child relationship in such amount as under all the circumstances of the case, may be just." Because the WDA was "designed to allay the harsh common law rule denying liability due to the death of the victim," it is remedial in nature and must be construed liberally.[5] *Oliver*, 151 Vt. at 629, 563 A.2d at 1004.

## A.

The question confronting us herein is whether the WDA permits a parent to recover damages for the loss of companionship resulting from the death of an adult child. The 1976 amendment recognizes a right of recovery for loss-of-companionship damages when the decedent is a minor child, but it makes no mention of adult children. Although we cannot be certain as to the reason for the omission, the legislative history of the amendment suggests that the Legislature was more concerned with clarifying the scope of damages available to the relatives of minor decedents than limiting the damages available upon the death of an adult decedent. See H. 58 (1975 Vt., Bien. Sess.) (sponsor's statement of purpose: "the purpose of this bill [is] to provide guidelines for the compensation to parents for the death of a minor child"); cf. *Caledonian-Record Publishing Co. v. Walton,* 154 Vt. 15, 25, 573 A.2d 296, 302 (1990) (a proviso may

---

[5] Defendants, however, argue that this action is brought under the DSA, which is penal in nature. Some courts have determined that the DSA is penal in nature and must be construed narrowly. See, e.g., *Matusak v. Chicago Transit Authority,* 165 Ill. App. 3d 1032, 1037, 520 N.E.2d 925, 928 (1988) (although also remedial, Dram Shop Act is "penal in character and should therefore be strictly construed"); *Beck v. Groe,* 245 Minn. 28, 34, 70 N.W.2d 886, 891 (1955) (since civil damage law is highly penal in nature, it should be strictly construed). But most courts, including this Court, have recognized that the DSA is primarily a remedial statute and must be construed liberally. See, e.g., *Ackerman v. Kogut,* 117 Vt. 40, 47, 84 A.2d 131, 136 (1951) (Dram Shop Act is to be liberally construed to accomplish its purposes: to discourage intoxication and encourage temperance); *Healey v. Cady,* 104 Vt. 463, 466, 161 A. 151, 152 (1932) (statute "created a remedy for wrong" that had not previously existed, and should be "liberally construed to effectuate its purpose"); *Kowal v. Hofner,* 181 Conn. 355, 366, 436 A.2d 1, 6 (1980) (Loiselle, J., dissenting) (in light of the remedial nature of the dram shop statute, it will be liberally construed where it applies); *Wendelin v. Russell,* 259 Iowa 1152, 1157, 147 N.W.2d 188, 192 (1966) (dram shop act is primarily a compensatory law and should be construed liberally), *overruled on other grounds, Lewis v. State,* 256 N.W.2d 181, 192 (Iowa 1977).

be added to an existing statute to exclude a possible misunderstanding of its extent).

In any case, the amendment neither expressly nor implicitly precludes a plaintiff who is seeking compensation for the death of an adult child from showing that, under the circumstances of a particular case, he or she is entitled to loss-of-companionship damages. In accordance with our analysis hereinafter, we do not believe the statute should be narrowly construed to foreclose the recovery of loss-of-companionship damages for parents of decedent adult children.[6] As previously noted, the WDA is to be liberally construed. The negative inference that defendants would have us adopt—that loss-of-companionship damages are not available to a parent of a deceased adult child—does not rise to the level of "plain meaning" so as to require us to hold otherwise, and we decline to do so. Cf. *McAllister v. AVEMCO Ins. Co.*, 148 Vt. 110, 112, 528 A.2d 758, 759 (1987) (Court will expand plain meaning of statute by implication only when necessary to make statute effective).

---

[6] Nor does our holding in *Hartnett v. Union Mutual Fire Insurance Co.*, 153 Vt. 152, 569 A.2d 486 (1989), disturb this belief. In *Hartnett*, the issue was whether specific terms within the 1976 amendment—"loss of love and companionship of the child" and "destruction of the parent-child relationship"— encompass damages for grief and mental anguish. *Id.* at 154, 569 A.2d at 487. We noted that the "statutory language of the 1976 amendment to § 1492(b) was taken from a Washington statute which, in all respects material to [that] case, is identical to § 1492(b) as amended," and that the Washington Supreme Court had interpreted the statute to permit recovery for grief and anguish. *Id.* at 154–55, 569 A.2d at 487–88. We then adopted the Washington court's analysis, citing the rule of statutory construction that presumes the legislature of the adopting state adopts the construction given the statute by the courts of the other state. *Id.*

The issue in this case, however, is whether the Vermont WDA permits parents to collect loss-of-companionship damages for the death of an adult child. The Washington Supreme Court has held that parents cannot recover damages under the Washington WDA unless the decedent child is a minor or the parents are dependent on the child. *Warner v. McCaughan*, 77 Wash. 2d 178, 184–86, 460 P.2d 272, 276–77 (1969). The court arrived at this conclusion based on its analysis of several sections of the Washington WDA that are completely different from the Vermont WDA, not on the language that was later adopted by the Vermont Legislature. See *id.* Indeed, the specific language adopted by Vermont was never mentioned in the decision. Because the Washington court's holding was based on sections of the Washington WDA that are not identical to the Vermont WDA, the reasoning in *Hartnett* does not apply here.

At first glance, our rules of statutory construction seem to work in favor of defendants. For instance, normally "we must presume that all language is inserted in a statute advisedly," *State v. Racine*, 133 Vt. 111, 114, 329 A.2d 651, 654 (1974); thus, one might argue that permitting pecuniary damages for the death of both a minor and an adult child, in effect, interprets the amendment as if the word "minor" were not there. Moreover, the use of the word "also" in the amendment evidences a recognition that pecuniary injuries did not formerly include what is bestowed by the amendment. See *The Roseville*, 11 F. Supp. 151, 153 (W.D. Wash. 1935) ("The use of the word 'also' shows an intent to give something which had not already been given."). Perhaps defendants' strongest argument is summed up in the Latin phrase "expressio unis est exclusio alterius"— the expression of one thing is the exclusion of another. That maxim applies "when in the natural association of ideas in the mind of the reader that which is expressed is so set over by way of strong contrast to that which is omitted that the contrast enforces the affirmative inference that that which is omitted must be intended to have opposite and contrary treatment." *Ford v. United States*, 273 U.S. 593, 611 (1927), *quoted in In re Downer's Estate*, 101 Vt. 167, 177, 142 A. 78, 82 (1928) (where statute specifically exempted towns from paying inheritance tax on legacies "for cemetery purposes," tax should apply to legacies for other purposes). Pursuant to this maxim, the inclusion of the term "a minor child" in the amendment evidences an intention to exclude an adult child. See *Grenafege v. Department of Employment Security*, 134 Vt. 288, 290, 357 A.2d 118, 120 (1976).

On the other hand, such canons are routinely discarded when they do not further a statute's remedial purposes. See *Herman & MacLean v. Huddleston*, 459 U.S. 375, 387 n.23 (1983); see also *Hardesty v. Andro Corp.*, 555 P.2d 1030, 1036 (Okla. 1976) (expressio unius maxim is "to be applied with great caution, is not of universal application, and is not conclusive as to the meaning of a statute"); cf. *State v. Baldwin*, 140 Vt. 501, 511, 438 A.2d 1135, 1140 (1981) ("Rules of construction are not laws, hard and inflexible, which *must* be applied in a given situation simply because it is possible to do so."). As noted, the Legislature passed the 1976 amendment, not to limit the damages

available to the relatives of adult decedents, but rather to further the remedial purposes of the WDA by developing the definition of pecuniary injuries.

By 1976, in Vermont, as elsewhere, the case law concerning the nature and extent of pecuniary loss available under the WDA was in a state of gradual intermittent development. Although no Vermont case had held that relational damages available for the death of a parent or spouse were also available for the death of a child, a parent could recover any reasonable "financial loss which the evidence shows will probably be caused by the death." It had already long been established that pecuniary loss was not restricted to loss of services, see *Lazelle v. Town of Newfane*, 70 Vt. 440, 445, 41 A. 511, 512 (1898) (pecuniary injury includes lost "intellectual and moral training and proper nurture by a child"), and that damages resulting from a child's death need not be restricted to damages accruing during the decedent's minority. *D'Angelo v. Rutland Ry. Light & Power Co.*, 100 Vt. 135, 137–39, 135 A. 598, 599 (1927).

We believe that rather than intending to restrict the development of case law recognizing that pecuniary loss is more than loss of services, the 1976 amendment intended to further that development by ensuring that such damages would be available for the death of a minor child. Because the type of damages available to adult decedents is not essential to the principal remedial purpose of the amendment, we shall not adopt the negative implication of the amendment argued by defendants. See *Pearson v. Robinson*, 318 N.W.2d 188, 191 (Iowa 1982) (despite failure of plaintiff to comply with statutory requirement imposed by the word "shall," court refused to dismiss complaint because statutory duty was not essential to main purpose of legislation). The amendment does not expressly restrict the damages available under the WDA, which must be construed with its remedial purposes in mind. The following statement by Justice Cardozo, though made in a different factual setting, is equally relevant here:

> Death statutes have their roots in dissatisfaction with the archaisms of the law . . . . It would be a misfortune if a narrow or grudging process of construction were to exemplify and perpetuate the very evils to be remedied.

*Van Beeck v. Sabine Towing Co.*, 300 U.S. 342, 350–51 (1937).

■ Having concluded that the 1976 amendment did not foreclose an award of loss-of-companionship damages to relatives of adult decedents, we now consider whether such damages constitute "pecuniary injury."

At common law, despite the fact that the courts allowed recovery for wrongful injury, a civil action for wrongful death was not permitted. See *Lazelle*, 70 Vt. at 443, 41 A. at 511–12 ("all actions for personal injuries died with the person injured"). Lord Campbell's Act, the predecessor of the American wrongful death acts, was adopted in England in the mid-nineteenth century to correct this anomaly. The act allowed the jury to award "Damages as they may think proportioned to the Injury resulting from such Death." Lord Campbell's Act, 1846, 9 & 10 Vict., ch. 93. The English courts held, however, that damages under the act must be based on pecuniary loss—a limitation imposed in many of the American wrongful death statutes, including Vermont's. 1849, No. 8 (now codified at 14 V.S.A. § 1492(b), (c)).

Many early cases, reflecting nineteenth-century social conditions when children were valued largely for their capacity to contribute to the family income, resulted in minimal awards representing the monetary loss occasioned by the parents' deprivation of their child's services. See, e.g., *Allen v. Moore*, 109 Vt. 405, 409, 199 A. 257, 258 (1938) ($200 verdict for wrongful death of 17-year-old daughter not grossly inadequate); see also *Sawyer v. Claar*, 115 Idaho 322, 327–28, 766 P.2d 792, 797–98 (Ct. App. 1988) (citing many cases, court compared "notoriously small" wrongful death awards made a half century ago with the more recent trend toward greater recoveries). Nonetheless, early on, this Court approvingly cited language stating that pecuniary damages should include "'all pecuniary loss of every kind which the circumstances of the particular case establish with reasonable certainty will be suffered by the beneficiary of the statute in the future.'" *D'Angelo*, 100 Vt. at 138, 135 A. at 599 (quoting *Bond v. United R.R.*, 159 Cal. 270, 277, 113 P. 366, 369 (1911)). Further, as in most jurisdictions, this Court did not always construe the term "pecuniary loss" in its strictest sense. See, e.g., *Lazelle*, 70 Vt. at 445, 41 A. at 512 (citing with approval cases that allowed damages for a child's loss of intellectual and moral training and proper nurture, as well as a widow's loss of her husband's care and protection).

By the early 1960s, some courts were rejecting the child-labor measure of pecuniary loss,[7] and expanding its scope to include loss of companionship. See, e.g., *Wycko v. Gnodtke*, 361 Mich. 331, 340, 105 N.W.2d 118, 122–23 (1960) (the human companionship between individual family members "has a definite, substantial, and ascertainable pecuniary value"); *Fussner v. Andert*, 261 Minn. 347, 352–54, 113 N.W.2d 355, 359 (1961) (considering present-day needs and experience, pecuniary loss should include loss within the broad definition of society and companionship). In recent years, a clear majority of jurisdictions with statutes limiting wrongful death recovery to pecuniary loss have expanded the scope of such loss to encompass loss of companionship of a child. See, e.g., *Bullard v. Barnes*, 102 Ill. 2d 505, 512, 515, 468 N.E.2d 1228, 1232, 1234 (1984); *Sanchez v. Schindler*, 651 S.W.2d 249, 252–53 (Tex. 1983). Further, many courts have refused to limit recovery for loss of companionship to situations where the decedent is a minor child. See, e.g., *Grandstaff v. City of Borger*, 767 F.2d 161, 172 (5th Cir. 1985) (Texas law allows parents to recover for loss of companionship, and no distinction is made based on whether the decedent is an adult or a minor child); *Sawyer*, 115 Idaho at 326, 766 P.2d at 796 (parent may recover for wrongful death of adult child based solely on loss-of-companionship damages); *Ballweg v. City of Springfield*, 114 Ill. 2d 107, 120, 499 N.E.2d 1373, 1379 (1986) (presumption of loss of society pertains to cases where decedent is adult child); *Ferguson v. Orr*, 427 N.W.2d 732, 735–36 (Minn. Ct. App. 1988) (jury's zero damage award in wrongful death action involving 57-year-old decedent overturned in the absence of sufficient evidence of estrangement); cf. *Frank v. Superior Court*, 150 Ariz. 228, 231–34, 722 P.2d 955, 958–61 (1986) (parents may maintain cause of action for loss of consortium against third party who negligently injured their adult child).

█ This Court has recently reiterated that the "term 'pecuniary injuries' does not limit recovery to purely economic losses." *Mobbs v. Central Vermont Ry.*, 150 Vt. 311, 316, 553

---

[7] Under this approach, pecuniary loss consisted of the financial burden upon the parents that resulted from loss of the child's services.

A.2d 1092, 1095 (1988).[8] We now hold that the loss of the comfort and companionship of an adult child is a real, direct and personal loss that can be measured in pecuniary terms. Children have an intrinsic value to their parents regardless of who is supporting whom at the time of death. Whether the decedent child is an adult or a minor, society recognizes the destruction of the parents' investment in affection, guidance, security and love. As the Arizona Supreme Court observed:

> Surely nature recoils from the suggestion that the society, companionship and love which compose filial consortium automatically fade upon emancipation; while common sense and experience teach that the elements of consortium can never be commanded against a child's will at any age. The filial relationship, admittedly intangible, is ill-defined by reference to the ages of the parties and ill-served by arbitrary age distinctions. Some filial relationships will be blessed with mutual caring and love from infancy through death while others will always be bereft of those qualities. Therefore, to suggest as a matter of law that compensable consortium begins at birth and ends at age eighteen is illogical and inconsistent with common sense and experience. Human relationships cannot and should not be so neatly boxed.

*Frank*, 150 Ariz. at 233, 722 P.2d at 960; cf. *Ballweg*, 114 Ill. 2d at 120, 499 N.E.2d at 1378–79 (expanding prior case law that presumed loss-of-companionship damages upon death of minor child, Illinois Supreme Court recognized presumption that pecuniary loss includes loss-of-companionship damages upon wrongful death of an adult child).

In some cases, the close, familial ties that unite a minor child with his or her parents may dissipate as the child becomes an adult. Nonetheless, the WDA does not preclude the parents of an adult child from showing that the death of their child did

---

[8] In *Hartnett*, 153 Vt. at 154, 569 A.2d at 487, we suggested that damages for mental anguish and loss of companionship were nonpecuniary in nature. As noted, however, the issue in that case was whether specific terms within the WDA encompass damages for grief and mental anguish. Our suggestion that loss-of-companionship damages are nonpecuniary in nature was neither the result of legal analysis nor necessary to the holding of that case.

in fact injure them by depriving them of the society of that child. Every case must stand upon its own facts and circumstances. In determining whether and what amount of damages are appropriate for loss of companionship, the court or jury should consider the physical, emotional, and psychological relationship between the parents and the child. Accordingly, among other things, the factfinder should examine the living arrangements of the parties, the harmony of family relations, and the commonality of interests and activities. See *Moore v. Lillebo,* 722 S.W.2d 683, 688 (Tex. 1986). Prior cases contrary to our holding herein are overruled.

## B.

Next, we consider whether plaintiffs may obtain damages for future earnings that would have accrued to the decedent. Plaintiffs concede that, under the facts of this case, they are unable to claim damages for loss of economic support; however, they argue that the Survival Statutes, 14 V.S.A. §§ 1451–1453, allow them to recover damages for loss of the decedent's future earnings.[9] We disagree. Because the DSA has its own survival provision, §§ 1451–1453 are not applicable here. Nevertheless, we see no reason to construe the DSA survival provision differently from the Survival Statutes, to which we look for guidance. In Vermont, as in the majority of jurisdictions, see W. Keeton, *supra,* § 126, at 943 n.9 and accompanying text, actions under the Survival Statutes allow recovery for loss and suffering from injuries endured by the decedent *prior* to the decedent's death. *Thayer v. Herdt,* 155 Vt. at 454, 586 A.2d at 1126; *Whitchurch v. Perry,* 137 Vt. at 469, 408 A.2d at 630. Damages for loss of future earnings are thus not available under the Survival Statutes, and we conclude that the same interpretation should be accorded the DSA survival provision.

---

[9] Under wrongful death statutes, survivors of the decedent may recover for injury to themselves resulting from the death; under the survival statutes, the representatives of the victim may recover for injury to the victim. J. Stein, Damages and Recovery: Personal Injury and Death Actions § 265, at 598 (1972).

## IV.

We must also determine whether the trial court erred in excluding plaintiffs' claims for punitive damages under the DSA. Although the DSA provides a "right of action" for those "injured in person, property or means of support," it neither expressly allows nor expressly excludes punitive damages. Defendants argue that punitive damages are inappropriate because the DSA is a strict liability statute, not requiring proof of proximate cause or a particular mental state. We conclude that the DSA does not preclude such damages.[10]

As a general rule, punitive damages are recoverable in any action for damages based upon tortious acts, see, e.g., *Pettengill v. Turo*, 159 Me. 350, 362, 193 A.2d 367, 374 (1963), as long as the unlawful or wrongful acts evinced personal ill will or showed a reckless or wanton disregard of another's rights. *Shortle v. Central Vt. Pub. Serv. Corp.*, 137 Vt. 32, 33, 399 A.2d 517, 518 (1979). The crucial inquiry is not the particular tort committed, but rather the nature of the defendant's conduct in committing it. W. Keeton, *supra*, § 2, at 11. A dram shop action is an action for damages based on one or more tortious acts. See *Winney*, 149 Vt. at 215, 542 A.2d at 270 ("legislature created a new tort"); see also 7 V.S.A. § 504 ("A judgment for the plaintiff under section 501 of this title shall be treated as rendered in an action founded on tort.").

The fact that the DSA has been referred to as a strict liability statute does not make punitive damages inappropriate in cases where the plaintiff persuades the factfinder that the defendant acted, at a minimum, with reckless disregard of another's rights. Regardless of the mental state required to obtain compensatory damages under the DSA, punitive damages cannot be awarded absent a showing that the defendant acted recklessly. Thus, punitive damages are not awarded on the basis of strict liability; indeed, the defendant must be more than negligent—he or she must act with reckless disregard—in order to incur punitive damages.

---

[10] Because we conclude that punitive damages are available to plaintiffs under the DSA, we need not address the issue of whether punitive damages are available under the WDA.

Defendants insist, however, that punitive damages are inappropriate because plaintiffs are not required to show that defendants' reckless conduct proximately caused plaintiffs' injuries. We disagree. In the broad sense of the term, "proximate cause," or "legal cause," assures that there is some reasonable connection between the act or omission of the defendant and the damages suffered by the plaintiff; it is the limitation, based on justice and social policy, that courts place upon the actor's responsibility for the consequences of his or her conduct. As a practical matter, the extent of one's responsibility for a given act depends on whether the actor has a duty to protect the person injured from the consequences of his or her act, which, in turn, often depends on the foreseeability of those consequences. See W. Keeton, *supra*, § 42, at 273.

Until the late 1950s, the courts unanimously held that a common-law negligence action was not available against tavern owners who served alcohol to intoxicated persons. See *Largo Corp. v. Crespin*, 727 P.2d 1098, 1100 (Colo. 1986). The rationale underlying this rule was that the conduct of the intoxicated person was a superseding, intervening "proximate cause" of the injury to the third party. See *id.* at 1101. In recent years, however, many courts and state legislatures have recognized that, in this day and age when travel by automobile is the norm, it is foreseeable that an intoxicated person will cause injury to others; therefore, commercial vendors have a duty to third parties to act with care when serving alcohol to their patrons. *Id.* at 1102. By enacting the DSA, the Vermont Legislature has imposed a duty on commercial vendors of alcohol to act with care when serving intoxicated customers.

Defendants rely heavily on *Healey v. Cady*, 104 Vt. 463, 466, 161 A. 151, 152 (1932), for the proposition that the DSA does not require the furnishing of alcohol to be the proximate cause of the resulting injury. What *Healey* actually stands for is that the plaintiff no longer need prove that the server's action is a proximate cause because the Legislature has presumed proximate cause when a dram shop sells liquor to an intoxicated person. See *Winney*, 149 Vt. at 215, 542 A.2d at 270. In other words, the server cannot claim that the action of the patron in getting drunk or driving was a superseding, intervening cause of the injury. The plaintiff must show, however, that the alcohol served

by the dram shop led to the driver's intoxication and that the injury was "in consequence of" the driver's impairment. See *Healey*, 104 Vt. at 466, 161 A. at 152. Accordingly, defendants are mistaken when they argue that plaintiffs are not required to show that Theron Webster's intoxication caused the accident in which their daughter died.

We agree with the Oregon Court of Appeals that the circumstances that give rise to the need for punitive damages may apply in a dram shop action, and that dram shops should not be exempt as a matter of law from such damages:

> We are not prepared to hold as a matter of law that serving a visibly intoxicated person cannot be as wanton and reckless an act as driving while intoxicated. When the act of serving an intoxicated person is found to meet the requisite disregard of social obligations, an award of punitive damages may be appropriate. We cannot say that punitive damages . . . will have any less of a deterrent effect on wanton and reckless conduct than in other types of cases in which punitive damages are traditionally approved by the courts.

*Pfeifer v. Copperstone Restaurant & Lounge, Inc.*, 71 Or. App. 599, 608, 693 P.2d 644, 650 (1985).

In *Pfeifer*, the court held that Oregon's dram shop statute, which makes a vendor liable for "damages incurred or caused by intoxicated patrons," did not preclude the imposition of punitive damages against a vendor that served alcohol to a driver who later caused the death of a child. *Id.* at 604–05, 693 P.2d at 648. Although the court supported its decision, in part, by pointing out that the statute did not create a new cause of action but rather codified a prior judicial decision, *id.* at 604, 693 P.2d at 647, it also noted that the statute evinced neither an intent to limit the type of damages available nor a statutory scheme intended as a substitute for punitive damages. *Id.* at 605–06, 607, 693 P.2d at 647, 649. The Vermont DSA does create a new statutory cause of action; however, like the Oregon statute, it neither explicitly nor implicitly precludes the imposition of punitive damages. We decline to impose such a limitation.

Defendants cite *Nelson v. Restaurants of Iowa, Inc.*, 338 N.W.2d 881, 885 (Iowa 1983), and *Coughlin v. Radosevich*, 372 N.W.2d 817, 820–21 (Minn. Ct. App. 1985), for the proposition that punitive damages are not available in a dram shop action

unless the statute expressly provides for them. *Nelson* is inapposite because the Iowa legislature had amended the statute to delete the express provision of punitive damages. See 338 N.W.2d at 884. In *Coughlin*, the court refused to allow punitive damages under its dram shop act because the statute did not expressly authorize them, and the court was unwilling to expand the statute beyond its explicit terms. 372 N.W.2d at 820. Since the Vermont DSA is to be construed liberally, and it does not preclude punitive damages, we decline to follow the Minnesota appellate court.

■ The Rotisserie defendants also contend that an award of punitive damages under the DSA would violate various constitutional guarantees. Because there has been no award of punitive damages as of yet, and because the issue has barely been briefed by the parties, these constitutional arguments are premature. Cf. *Lane Construction Corp. v. Vermont Electric Generation & Transmission Coop.*, 150 Vt. 419, 420–21, 553 A.2d 1096, 1098 (1988) (question of applicability of doctrine of legal impracticability was premature because doctrine provided no basis for overturning judgment appealed from).

## V.

■ The Rotisserie defendants also raise four issues on cross-appeal. First, they argue that the trial court should have granted their pretrial motion to exclude expert evidence regarding the signs of intoxication that would be exhibited by a person having a certain blood-alcohol content. We decline to review the court's preliminary evidentiary ruling at this interlocutory stage of the proceedings before final consideration of the issue in the context of the trial. See *In re Pyramid Co.*, 141 Vt. 294, 300–01, 449 A.2d 915, 918–19 (1982); *State v. Karcz*, 134 Vt. 187, 188, 352 A.2d 687, 688 (1976).

■ Second, defendants argue that the trial court erred in dismissing Theron Webster, the driver, as a defendant. We agree with the superior court that the real issue here concerns the apportionment of damages should the jury find for plaintiffs, not whether a settling party should be kept in the case, and that the trial judge should be the one to consider this issue if it arises. At this point, the issue is premature.

■■ Third, defendants argue that the Legislature's delegation of authority to the Liquor Control Board to make rules concerning the furnishing of alcohol is unconstitutional.[11] Defendants ask that we distinguish or disregard *Ackerman v. Kogut*, 117 Vt. 40, 46–47, 84 A.2d 131, 136 (1951), where, in an action for damages under the DSA, this Court held that a statute giving the Liquor Control Board authority "'to prescribe such rules and regulations . . . as may be necessary to carry out the provisions of this chapter'" did not constitute an unconstitutional delegation of power. We decline to disregard *Ackerman* and do not think it can be distinguished. Chapter 5 of Title 7 sufficiently designates and delimits the areas of administrative regulation permitted by the Department of Liquor Control; therefore, it does not constitute an unconstitutional delegation of power. See *Vermont Home Mortgage Credit Agency v. Montpelier Nat'l Bank*, 128 Vt. 272, 278–79, 262 A.2d 445, 449 (1970); *State v. Auclair*, 110 Vt. 147, 163, 4 A.2d 107, 114 (1939) (agency charged with duty of administering a statute may be vested with wide, though not unrestrained, discretion).

Fourth, defendants contend that General Regulation 19 of the Revised Regulations Governing the Sale of Alcoholic Beverages, which makes it unlawful to furnish alcohol to a person "apparently under the influence of intoxicating liquor,"[12] is unconstitutionally vague. We disagree.

■■■ Prior Vermont case law has adequately defined "apparently under the influence." In *In re Tweer*, 146 Vt. 36, 38, 498 A.2d 499, 500–01 (1985) (citations omitted), we stated,

---

[11] 7 V.S.A. § 104(8) provides that the Liquor Control Board shall "[m]ake rules and regulations concerning, and issue permits under such terms and conditions as it may impose for the furnishing . . . of alcohol . . . ."

As noted, in amending 7 V.S.A. § 501 in 1987, the Legislature replaced the term "unlawful" with specific delineations of prohibited conduct. See n.1, *supra.* The four types of prohibited conduct correspond with the conduct proscribed by Liquor Control Board regulations promulgated prior to the amendment.

[12] The 1987 amendment to 7 V.S.A. § 501 defines "apparently under the influence of intoxicating liquor" as "a state of intoxication accompanied by a perceptible act or series of actions which present signs of intoxication." 7 V.S.A. § 501(h).

> The prohibition of sales to a person "apparently" under the influence of liquor requires that the purchaser's intoxication be observable. Moreover, the observation must be made by the one selling the liquor. It is not enough that the purchaser's intoxication was apparent to someone else. The seller, of course, is not permitted to close his eyes to that which is apparent. The seller has a duty to observe that which is observable to a reasonable person.

We conclude that the regulation is "sufficiently clear to give a person of ordinary intelligence a reasonable opportunity to know what is proscribed." *Brody v. Barasch*, 155 Vt. 103, 110, 582 A.2d 132, 137 (1990); see *Zucker v. Vogt*, 329 F.2d 426, 430 (2d Cir. 1964) (Connecticut dram shop act not unconstitutionally vague; the defendant's claim that he cannot tell with reasonable certainty what intoxication is "has a hollow ring"); *Largo Corp.*, 727 P.2d at 1102 (noting "visibly intoxicated" statutory language, court held that "tavern owner can, in the exercise of reasonable judgment, determine whether a person is fit to consume additional alcohol"). A regulation need not define a given term or detail every nuance of its meaning in order to comply with constitutional requirements; "[s]tatutory language that conveys a definite warning as to proscribed conduct when measured by common understanding and practices will satisfy due process." *Brody*, 155 Vt. at 111, 582 A.2d at 137. That standard is met here.

*Reversed and remanded.*