**Stephen W. Kimbell and Robert S. Sherman, d/b/a Kimbell & Sherman, et al. v. Donald M. Hooper, Secretary of State, and Jeffrey L. Amestoy, Attorney General**

[665 A.2d 44]

No. 94-180

Present: **Allen, C.J., Gibson and Morse, JJ., and Peck, J. (Ret.) and Jenkins, Supr. J., Specially Assigned**

Opinion Filed August 4, 1995

---

*Charles F. Storrow* of *Kimbell & Storrow*, Montpelier, for plaintiffs-appellants.

*Jeffrey L. Amestoy*, Attorney General, and *Phillip J. Cykon*, Assistant Attorney General, Montpelier, for defendants-appellees.

**Morse, J.** Plaintiffs, professional lobbyists, appeal a declaratory judgment of the Washington Superior Court ruling that Vermont's lobbying disclosure law is not so vague or overbroad as to violate Articles 13 and 20 to Chapter I of the Vermont Constitution or the First Amendment to the United States Constitution. We affirm.

Vermont has regulated the lobbying profession since 1939. See 1939, No. 240 (An Act Requiring Legislative Counsel and Agents to Register During Session of the General Assembly). The lobbying disclosure law under scrutiny today became effective in 1990. See 1989, No. 160 (Adj. Sess.); see also 2 V.S.A. §§ 261–268 (the Act). In general, the 1990 Act requires lobbyists to register with the Secretary of State and to report expenditures related to their efforts to influence legislation. Nothing in the Act as enacted or amended prohibits lobbying or attempts to censor particular messages or points of view.

Plaintiffs have not been charged with a violation of the Act, nor have they expressed their intention to violate its provisions; rather, they facially challenge the 1993 amended definitions of the terms "Expenditure" and "Lobbying" found in 2 V.S.A. § 261(5) and (9).[1]

---

[1]The definitions in issue are:

(5) "Expenditure" means a payment, distribution, loan, advance, deposit or gift of money or anything else of value and includes a contract, promise or agreement, whether or not legally enforceable, to make an expenditure. *"Expenditure" includes sums expended in connection with lobbying, including research, consulting and other lobbying preparation and travel, meals and lodging.*

. . . .

(9) "Lobby" or "lobbying" means:

(A) to communicate orally or in writing with any legislator or administrative official for the purpose of influencing legislative or administrative action;

(B) *solicitation of others to influence legislative or administrative action;*

(C) *an attempt to obtain the goodwill of a legislator or administrative official by communications or activities with that legislator or administrative official intended ultimately to influence legislative or administrative action; or*

(D) *activities sponsored by an employer or lobbyist on behalf of or for the benefit of the members of an interest group, if a principal purpose of the activity is to enable such members to communicate orally with one or more legislators or administrative officials for the purpose of influencing legislative or administrative action or to obtain their goodwill.*

(10) "Lobbyist" means a person who engages in lobbying for compensation of more than $500.00 or expends more than $500.00 lobbying in any calendar year.

These amendments require lobbyists to report a broader spectrum of lobbying efforts, such as research and other preparatory work and indirect contacts to influence legislators. Because plaintiffs facially challenge the Act, we have no factual context in which to evaluate its constitutionality. Plaintiffs also challenge the addition of § 266(3), which, among other things, prohibits lobbyists from contributing to political campaigns of members of the General Assembly while the legislature is in session.[2]

## I.

Without doubt, lobbying implicates First Amendment guarantees of petition, expression, and assembly, as well as similar rights found in the Vermont Constitution.[3] See *United States v. Harriss*, 347 U.S. 612, 625 (1954). The United States Supreme Court, however, has never defined the scope of these rights. See generally Thomas, *Easing the Pressure on Pressure Groups: Toward a Constitutional Right to Lobby*, 16 Harv. J.L. & Pub. Pol'y 149 (1993).

Plaintiffs make numerous arguments that essentially contend the Act sweeps too broadly because, in their view, *Harriss* and *United States v. Rumely*, 345 U.S. 41 (1953), provide that a state's legitimate interest in regulating lobbying extends only to regulation of *direct* communications with government officials. The Act requires lobbyists

---

2 V.S.A. § 261(5) and (9) (emphasis added to indicate 1993 amendments).

[2] It shall be prohibited conduct:

. . . .

(3) when the general assembly is in session, until adjournment sine die, for a legislator or administrative official to solicit a political campaign contribution as defined in 17 V.S.A. § 2801 from a registered lobbyist or registered employer or for a registered lobbyist or registered employer to make or promise a political campaign contribution to any member of the general assembly or any member's campaign committee.
2 V.S.A. § 266(3).

[3] "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

"That the people have a right to assemble together to consult for their common good — to instruct their Representatives — and to apply to the Legislature for redress of grievances, by address, petition or remonstrance." Vt. Const., ch. I, art. 20.

"That the people have a right to freedom of speech, and of writing and publishing their sentiments, concerning the transactions of government, and therefore, the freedom of the press ought not to be restrained." Vt. Const., ch. I, art. 13.

Plaintiffs have not argued that the Vermont Constitution means anything different than the federal counterpart; consequently, we address their First Amendment argument only.

to report expenses for activities that take place outside the presence of legislators or that are less directly related to influencing legislation than person to person contact with a member of the General Assembly. We do not agree, however, that *Harriss* and *Rumely* so narrowly limit a state's reach.

In *Rumely*, 345 U.S. at 47, the Court construed "lobbying" — undefined in the Federal Regulation of Lobbying Act of 1946 — to mean "representations made directly to the Congress, its members, or its committees." The Court construed the term narrowly to avoid deciding the constitutional question presented there, not to define the limits of a state's interests in regulating lobbying activities. See *id.* at 46–47 (Court abstained from constitutional adjudication); see also *Harriss*, 347 U.S. at 623 (construing similar language narrowly to avoid constitutional doubts).

Provisions that reach "indirect" lobbying activities beyond the parameters found in *Rumely* and *Harriss* are not, as plaintiffs would urge, necessarily unconstitutional; in fact, the Court intimated in these cases that Congress could require more stringent reporting. See *Harriss*, 347 U.S. at 620 ("If the construction urged by the Government is to become law, that is for Congress to accomplish by further legislation."); *Rumely*, 345 U.S. at 47 (if Congress wished to extend reach of statute, it would have used more explicit language). Indeed, even the Court's narrowest construction of "lobbying" included indirect lobbying efforts:

> [W]e believe this language should be construed to refer only to "lobbying in its commonly accepted sense" — to direct communication with members of Congress on pending or proposed federal legislation. The legislative history of the Act makes clear that, at the very least, Congress sought disclosure of such direct pressures, exerted by the lobbyists themselves or through their hirelings *or through an artificially stimulated letter campaign.*

*Harriss*, 347 U.S. at 620 (emphasis added). Consequently, plaintiffs' argument that the Act goes beyond the narrow construction of direct communication given lobbying in *Harriss* and *Rumely* brings us only to the threshold of analysis. The question then is whether Vermont's lobbying law is not focused enough — narrowly tailored — and sweeps within its coverage protected expressive and associational values.

■ We begin by noting that lobbying disclosure laws are not subject to the same strict scrutiny as laws that impinge on pure speech. *Broadrick v. Oklahoma*, 413 U.S. 601, 612–13 (1973); Note, *The First Amendment Overbreadth Doctrine*, 83 Harv. L. Rev. 844, 920–21 (1970) (characterizing lobbying regulation as "remedial," and "remedial element in disclosure laws which generate information of relevance to a democratic public"). Laws regulating such political activities in a neutral, noncensorial manner will be stricken as overbroad only as a last resort. *Broadrick*, 413 U.S. at 613. The Supreme Court stated, in upholding a federal act restricting federal employees' partisan political activities, that

> facial overbreadth adjudication is an exception to our traditional rules of practice and . . . its function, a limited one at the outset, attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from "pure speech" toward conduct . . . . [P]articularly where conduct and not merely speech is involved, we believe that the overbreadth must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.

*Id.* at 615. Thus, claimed flaws must be of a substantial concern in the context of the statute as a whole before we will invalidate the statute. Cf. *id.* at 616 n.14. Because this is a facial overbreadth challenge to a law that does not regulate any particular message or point of view and which does not block access to the political process, we believe that the Act is not substantially overbroad. For the reasons discussed below, we conclude, as the Court did in *Broadrick*, that any impingement on the First Amendment may be addressed on a case-specific basis. See *id.* at 615–16.

■ In part, we decide not to strike the Act as overbroad on its face because lobbying disclosure laws are supported by several compelling interests. One important governmental interest in requiring disclosure of lobbyist information is protecting the integrity of the governmental process:

> Present-day legislative complexities are such that individual members of Congress cannot be expected to explore the myriad pressures to which they are regularly subjected. Yet full realization of the American ideal of government by elected representatives depends to no small extent on their ability to properly evaluate such pressures. Otherwise the

> voice of the people may all too easily be drowned out by the voice of special interest groups seeking favored treatment while masquerading as proponents of the public weal. This is the evil which the Lobbying Act was designed to help prevent.

*Harriss*, 347 U.S. at 625. The United States Supreme Court has referred to this interest as "vital," *id.* at 626, and has held similar governmental interests sought to be vindicated by disclosure requirements to be of sufficient magnitude to counterbalance infringements on First Amendment rights. Cf. *Buckley v. Valeo*, 424 U.S. 1, 66–67 (1976) (per curiam) (interests in aiding voters in evaluating candidates, in deterring corruption and appearance of corruption, and in recordkeeping to detect violations of contribution limits); see also *Montana Automobile Ass'n v. Greeley*, 632 P.2d 300, 303 (Mont. 1981) (compiling cases where compelling interests found to support disclosure requirements).

Plaintiffs accurately describe in their brief why the government has an interest in regulating communications with lawmakers. They acknowledge that

> lobbying involves considerably more than direct contacts with legislators and executive branch officials . . . Lobbying often entails . . . considerable amounts of research, extensive meetings with clients and others, preparation of materials, the formation of "coalitions" with others who have similar interests, the inculcation of good will on the part of legislators and executive branch officials, participation in talk shows, and the sending of letters to newspaper editors.
>
> . . . .
>
> The modern day realities of the legislative and administrative processes are such that more often than not it is impractical, if not impossible, for any single individual or organization that is not devoted almost exclusively to political activity to have any meaningful impact on those processes. Rather, in order to successfully cause state government to do something (or not do something, as the case may be), one must first have a good command, by way of extensive research, of the technical and substantive issues involved in the particular subject under consideration. Given the complexity of many of the subjects to which state government now devotes its attention, such as health care

reform, this is no small task. However, even a good under-
standing of the particular subject matter is not enough. In
addition one must know the intricacies of the process, know
all the players in the process (and, to a certain extent, the
nature of their personalities) and last, but not least, under-
stand the role of and be able to advantageously utilize the
media and other third parties to influence the process. *These
are the skills that one must have in order to successfully
petition state government.*

(Emphasis added.)

If these "background activities," most of which would fall under-
neath our statute's definition of lobbying, are necessary to reasonably
effectuate the right to petition, then reporting them is no less
imperative than reporting direct contacts. Properly evaluating the
governmental process, and the influence lobbyists bring to bear upon
it, implicates indirect as well as direct communication and activities
needed to get the message across.

■ ■ Finally, in determining that the Act does not exceed its
"plainly legitimate sweep" by requiring disclosure of "background
activity" costs, we consider whether the Act is narrowly tailored to
accomplish its purpose. As the United States Supreme Court has
said: "[D]isclosure requirements . . . appear to be the least restric-
tive means of curbing the evils of campaign ignorance and corruption
. . . ." *Buckley*, 424 U.S. at 68. Similarly, Vermont's lobbyist disclo-
sure law is a reasonable means of evaluating the lobbyist's influence
on the political process. Plaintiffs have not specified any particular
burden or deterrent effect imposed by the law, other than that the
restrictions have a "chilling effect" that "will, for whatever reason,
reduce the likelihood" that a person would petition the government.
Plaintiffs, however, do not object to the most chilling aspects of
disclosure laws because they concede that a compelling public interest
exists for requiring lobbyists to register and disclose who they
represent and what they are lobbying for. Without a factual record of
specific enforcement measures to prevent anyone from influencing
legislators, we cannot gauge the extent of the "chilling effect"
resulting from the reporting of mere financial matters. See *id.* at
68–72 (substantial interest in disclosure of campaign contribution
outweighed generally alleged harm; while disclosure may even expose
contributors to harassment and retaliation, factual showing required
to invalidate disclosure requirement). The mere fact that First

Amendment rights are implicated does not mean those rights are burdened.

Plaintiffs imagine various scenarios where the legitimate reach of the Act may be tenuous, and where expenditures bear little correlation to the state's interest in disclosure. Yet, a law will not be declared unconstitutional on its face on the basis that it might be unconstitutionally enforced under speculative circumstances. Cf. *State v. Cantrell*, 151 Vt. 130, 133–34, 558 A.2d 639, 641–42 (1989) (recognizing, in criminal case, exception to standing rules where statute involving First Amendment freedoms is challenged on vagueness grounds). Laws are to be interpreted in a reasonable way to avoid constitutional overreaching; imagined situations are not sufficient to undermine the Act's constitutionality. See *State v. Whitchurch*, 155 Vt. 134, 140, 577 A.2d 690, 693 (1990) (probation conditions will be stricken on facial attack only if they cannot be justified by any set of circumstances); see also *Commission on Independent Colleges & Univ. v. New York Temporary State Comm'n on Regulation of Lobbying*, 534 F. Supp. 489, 497 (N.D.N.Y. 1982) (courts should not strain to find unconstitutional applications, or base overbreadth on other than proven overreaching). Plaintiffs' hypothetical situations do not persuade us to invalidate the Act, and we will not address them individually. Cf. *Harriss*, 347 U.S. at 626 (even assuming disclosure deters petition of government in hypothetical borderline situations, such deterrence results from self-censorship and is too remote to strike statute). Plaintiffs' war with the disclosure law must wait until they can focus an attack on a specific dispute.

## II.

■ Vermont's lobbying disclosure law is also sufficiently definite to survive a "void-for-vagueness" challenge. The vagueness doctrine, closely related to the overbreadth doctrine, is based on the rationale that persons should not be "chilled in their exercise of constitutional rights because of their fear of criminal sanctions." *Commission of Independent Colleges & Univ.*, 534 F. Supp. at 502. A statute is void for vagueness when it "either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application." *Zwickler v. Koota*, 389 U.S. 241, 249 (1967) (citiation omitted); see also *Rutherford v. Best*, 139 Vt. 56, 60, 421 A.2d 1303, 1306 (1980) (due process requires that person have fair warning of what conduct is prohibited). Even under these standards, however, fears of prosecu-

tion must be based on reasonable interpretations of the statute in question, see *Commission of Independent Colleges & Univ.*, 534 F. Supp. at 502 (court could not find that lobby law was designed to reach "*any* sort of indirect activity which might ultimately impact upon the governmental decision-making process") (emphasis in original), and a statute need not detail every circumstance that would amount to a violation. *Id.* As the Wisconsin Supreme Court has said:

> The lobbyist himself must first decide whether an expenditure made is one which comes within the class of those which must be reported, and in a sense he may be required to speculate when making his report whether any of his expenditures do so. But that is true of nearly all prohibitory legislation. . . . It is not required that a statute be so elaborate in its detailed specifications as to meet every possible state of circumstances that may arise under it.

*State v. Hoebel*, 41 N.W.2d 865, 867 (Wis. 1950).

Plaintiffs give two reasons to strike down the law under this test. According to plaintiffs, guidelines issued by the Secretary of State acknowledge the inherent vagueness of the Act, and the term "research" as found in the definition of "Expenditure" is so indefinite as to defy reasonable definition.

The Secretary of State's guidelines, however, are sensible interpretations of the law's straightforward requirements. For example, 2 V.S.A. § 261(9)(C) defines lobbying as "an attempt to obtain the goodwill of a legislator . . . intended ultimately to influence legislative . . . action." While pointing out that "'[g]oodwill lobbying' is difficult to define *in the abstract*," the Secretary's guidelines provide lobbyists with sensible criteria for distinguishing between personal friendships and lobbying: "Social contacts constitute 'goodwill lobbying' whenever a person is paid more than $500 to lobby on behalf of another and the lobbyist is compensated for a social contact, is expected to maintain a social relationship for the purpose of furthering the employer's interests, or is reimbursed for expenses related to a social activity which includes a legislator or an administrative official." (Emphasis added).

A general regulation such as the lobbying law here may not appear vague at all when applied to a specific context. A lobbyist taking key legislators to an expensive dinner to talk about a pending bill is a sufficiently concrete situation to pass the rigors of definiteness. Paying for the meal, even if the lobbyist did not sit with the legislative

leaders, is also definite. Of course, because plaintiffs brought this case as a facial challenge, we have no specific context to test the Act's constitutionality.

Plaintiffs also quibble with the Act's definition of "Expenditure." Section 261(5) defines "Expenditure" to include "sums expended in connection with lobbying, including research," and plaintiffs argue that "research" — undefined by the statute — is too vague a term. Plaintiffs rely solely on *Montana Automobile Ass'n*, 632 P.2d at 309, in which the Montana Supreme Court found the term "original and derivative research" too vague to apprise lobbyists of the extent of their duty to report. We disagree with that conclusion.

Requiring that every term in a statute be defined would be an impossible burden. "A regulation need not define a given term or detail every nuance of its meaning in order to comply with constitutional requirements . . . ." *Clymer v. Webster*, 156 Vt. 614, 636, 596 A.2d 905, 918 (1991). The term "research" is sufficiently clear to put a person of ordinary intelligence on notice that reporting of research expenditures is required; it is commonly understood by students in school, lawyers, and, undoubtedly, by lobbyists. Webster's New International Dictionary 2118 (2d ed. 1961) defines research as "Careful or diligent search; a close searching; . . . studious inquiry or examination; specifically and usually, critical and exhaustive investigation or experimentation having for its aim the discovery of new facts and their correct interpretation, the revision of accepted conclusions, theories or laws . . . ." See also *Brody v. Barasch*, 155 Vt. 103, 111, 582 A.2d 132, 137 (1990) ("Statutory language that conveys a definite warning as to proscribed conduct when measured by common understanding and practices will satisfy due process.").

### III.

Lastly, plaintiffs argue that the ban on soliciting and making contributions to individuals' political campaigns is overbroad. See 2 V.S.A. § 266(3). Limitations on campaign contributions that burden the contributor's freedom of association are not forbidden so long as "the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." *Buckley*, 424 U.S. at 25.

The Federal Election Campaign Act of 1971 under scrutiny in *Buckley* limited political contributions to candidates for federal office. In addition to an overall annual limitation of $25,000 in contributions by individual contributors, individuals and groups were limited to

contributions of $1,000 and political committees to contributions of $5,000 to any one candidate per election. *Id.* at 13 and n.12. The Court justified these limitations in the interest of avoiding actual or perceived improper influence stemming from large campaign contributions. *Id.* at 26–27.

If anything, the restrictions in § 266(3) are less burdensome than the dollar limits upheld in *Buckley,* and do not compare to the total prohibition held unconstitutional in *Fair Political Practices Comm'n v. Superior Court,* 599 P.2d 46, 59, 157 Cal. Rptr. 855, 862 (1979), *cert. denied,* 444 U.S. 1049 (1980). Section 266(3) sets no overall limits. It functions solely as a timing measure, banning contributions to individual members only while the General Assembly is in session. The Act does not prohibit contributions to political parties during session, only those to individual legislators. Consequently, the limited prohibition focuses on a narrow period during which legislators could be, or could appear to be, pressured, coerced, or tempted into voting on the basis of cash contributions rather than on consideration of the public weal. The legislature has chosen a narrowly drawn measure to avoid a serious appearance of impropriety, and we see no reason to strike that measure down.

*Affirmed.*