Shirley **MEARS**, as Administratrix of the Estate of Charles G. Mears v. William B. **COLVIN** and Edwin Andrew Colvin, as Co-Trustees of the Edwin A. Colvin Trust, and Edwin Adolf Colvin, Individually

[768 A.2d 1264]

No. 99-331

December 15, 2000. Plaintiff Shirley Mears, on behalf of the estate of Charles Mears, appeals from a judgment based on a jury verdict in favor of defendants, the owners of an apartment building in which decedent perished in a fire. Among other claims, plaintiff contends the trial court erred in admitting unfairly prejudicial evidence concerning plaintiff's alleged lesbian affair, and the out-of-wedlock teenage pregnancies of decedent's daughters. We agree and reverse.

This case arose out of an early morning fire in a three-unit apartment building in Shaftsbury. Decedent lived in a second-floor unit of the building. Although it appeared from the evidence that decedent was awake and alerted to the fire, his badly burned body was found near a second floor window, clothed in a T-shirt, sweat shirt, and sweat pants. Medical evidence established that he had died of smoke inhalation and carbon monoxide poisoning. All of the other tenants managed to escape.

Plaintiff's negligence action was premised on two theories. First, plaintiff argued that the absence of a smoke alarm had critically reduced the time available to decedent to flee before being engulfed in smoke and flames. There was evidence that no alarm had sounded, and plaintiff alleged that this was caused by defendants' failure to install hard-wired smoke detectors, in violation of a fire code provision. Plaintiff also argued at trial that defendants had failed to provide adequate exits from decedent's apartment, contributing to his inability to escape.

Defendants countered with evidence that decedent's apartment had several adequate avenues of escape, and that notwithstanding any possible code violation, decedent had been alerted to the fire, indeed he was heard by a witness who later fled the building. Defendants theorized that decedent had squandered his opportunity to get to safety by stopping to dress or to save possessions, and that he may have been lethargic or exercised poor judgment because of a number of prescribed medications.

Defendants introduced extensive evidence, over objection, to rebut plaintiff's claim that decedent's loss had deprived his next of kin — including his wife (plaintiff), four adult daughters and one minor child — of a close and loving relationship with decedent. That evidence included testimony that plaintiff had separated from decedent and was involved in a lesbian relationship. Plaintiff had filed a pretrial motion in limine to exclude reference to the alleged affair, as well as other evidence relating to decedent's alleged suicide attempts and prescribed medications. The court excluded reference to these matters during opening argument, warned counsel about their potential prejudicial effect, but reserved ruling on their admissibility.

In her testimony, plaintiff acknowledged that she had separated from decedent at the time of his death, but denied that they planned to divorce. On cross-examination, she denied that she was seeing anyone else during the separation. Defense counsel then asked for an in chambers conference, in which he announced his intention to inquire into plaintiff's alleged lesbian affair, arguing its relevance to the quality of her relationship with decedent. The court sustained plaintiff's objection to the proposed line of inquiry.

Later, however, during cross-examination of Marie Boisvert, another tenant in decedent's building, defense counsel elicited testimony that decedent had confided in Boisvert that plaintiff was divorcing him. Counsel then asked if decedent had told her why. An objection was interposed and, contrary to the court's initial sustaining of the objection, overruled. The witness then responded that it was "because [plaintiff] wanted to be with another woman." Counsel pursued the subject, asking, "In fact she was having an affair

with another woman; isn't that right?" The witness responded, "Right." Under further cross-examination, the witness also testified that decedent had told her about the affair on more than one occasion, that plaintiff was in fact living with the other woman, that the other woman worked with decedent, and that the affair had caused decedent to be hospitalized for a major depression.

Defense counsel returned to the subject on recross-examination of the same witness, stating that decedent had "discussed the fact that [plaintiff] was seeing another woman, as a matter of fact; isn't that right?" The witness responded that it was. Counsel then inquired: "He didn't say, 'I'm suspicious about this,' or 'I'm blundering,' or anything like that, did he?" Plaintiff's counsel interjected: "Your honor, I think this is really just too much." The court thereupon admonished counsel not to be argumentative, and counsel withdrew the question. Plaintiff later returned to the stand to deny that she was a homosexual, or that she had ever been involved in a homosexual relationship.

Decedent's four adult daughters, who ranged in age from twenty-six to thirty years old at the time of trial, also testified that his death had deprived them of a loving, supportive father. Defendants, in response, attempted to show on cross-examination that decedent had provided little emotional or financial support to his children. Over objection, counsel adduced evidence that decedent's daughter Wendy had dropped out of high school and been on welfare, his daughter Brandy had separated from her husband, dropped out of high school, and had an out-of-wedlock child when she was fifteen, his daughter Pammy had several children when she was a teen by several different fathers, and his daughter Tammy had dropped out of high school and had an out-of-wedlock child when she was eighteen.

Through additional testimony defendants adduced evidence that decedent had attempted suicide on several occasions during the year before his death, and was taking a number of medications, including anti-depressants. Defendants also confirmed through the testimony of decedent's psychiatrist and treating physician that he was angry with his wife, and depressed because he believed she was involved in an extramarital affair.

The jury returned a special verdict, finding defendants forty percent negligent and decedent sixty percent negligent. Accordingly, the court ordered that plaintiff take nothing, and entered judgment for defendants. Plaintiff later moved for judgment as a matter of law or a new trial, arguing, among other claims, that defendants' "repeated character assassination," including evidence of plaintiff's alleged lesbian affair and the daughters' out-of-wedlock teen pregnancies, had unfairly prejudiced the jury. The court denied the motion, finding that the evidence was relevant and not unduly prejudicial. This appeal followed.

Under the Wrongful Death Act, the spouse and next of kin of a person whose death is caused by the wrongful act, neglect or default of another may recover "such damages as are just, with reference to the pecuniary injuries resulting from such death." 14 V.S.A. § 1492(b). This and other courts have held that such injuries are not limited "to purely economic losses," *Mobbs v. Central Vt. Ry.*, 150 Vt. 311, 316, 553 A.2d 1092, 1095 (1988), and may include recovery for the loss of companionship of a spouse or child, see *Clymer v. Webster*, 156 Vt. 614, 629-30, 596 A.2d 905, 914 (1991), as well as "compensation for lost intellectual, moral and physical training, or the loss of care, nurture and protection." *Mobbs*, 150 Vt. at 316, 553 A.2d at 1095. In determining damages, the factfinder may "consider the physical, emotional, and psychological relationship" of the parties, as well as their "living arrangements . . ., the harmony of family relations, and the commonality

of interests and activities." *Clymer*, 156 Vt. at 630, 596 A.2d at 914.

The breadth of matters relevant to the issue of damages in a wrongful death action suggests that evidence of an extramarital affair may be admissible to rebut or discredit a claim that the decedent's death deprived the surviving spouse of a faithful, loving companion. Indeed, a number of courts have so held. See, e.g., *Morales v. Superior Court*, 160 Cal. Rptr. 194, 197 (Ct. App. 1979); *Countryman v. County of Winnebago*, 481 N.E.2d 1255, 1259-60 (Ill. App. Ct. 1985); *Strelecki v. Firemans Ins. Co.*, 276 N.W.2d 794, 801 (Wis. 1979). Evidence of the decedent's relationship with his children — or lack thereof — is also, of course, highly relevant to a claim for loss of companionship and society. See *Mobbs*, 150 Vt. at 316, 553 A.2d at 1095; *Cooper v. Chicago Transit Auth.*, 505 N.E.2d 1239, 1246 (Ill. App. Ct. 1987).

That some aspects of a decedent's family relations may be relevant and admissible in a wrongful death action does not, however, mean that all aspects of family relations are relevant and admissible. There is a line to be drawn when the potentially inflammatory nature of the information exceeds its probative value. See V.R.E. 403; *Haynes v. Golub Corp.*, 166 Vt. 228, 236, 692 A.2d 377, 382 (1997). A trial court's duty is to balance these factors, to ensure that the primary purpose or effect of disputed evidence is to advance an issue in the case rather than "to appeal to a jury's sympathies, 'arous[e] its sense of horror, provok[e] its instinct to punish, or trigge[r] other mainsprings of human action [that] may cause a jury to base its decision on something other than the established propositions in the case.'" *State v. Bruyette*, 158 Vt. 21, 31, 604 A.2d 1270, 1274 (1992) (quoting 1 J. Weinstein & M. Berger, Weinstein's Evidence § 403[03], at 403-33-39 (1991)).

The trial court is accorded wide latitude in making such evidentiary rulings, and we will not disturb its decision absent a showing of abuse of discretion. See *State v. Webster*, 165 Vt. 54, 56, 675 A.2d 1330, 1332 (1996).

To rebut plaintiff's claim for loss of companionship and society, the defense here adduced substantial credible evidence through decedent's psychiatrist and treating physician that decedent believed plaintiff had been involved in an extramarital affair. As noted, such evidence has been widely held to be relevant to claims for loss of companionship or loss of consortium. The additional evidence adduced by defendants concerning the homosexual nature of the extramarital affair was another matter. Such evidence added virtually nothing of probative value to the case. The only effect, if not indeed the purpose, of defense counsel's repeated probing of the witness Boisvert concerning the homosexual aspect of the alleged relationship was to appeal to homophobic prejudices. See *Everett v. Town of Bristol*, 164 Vt. 638, 640, 674 A.2d 1275, 1277 (1996) (mem.) (reversing judgment on ground that psychiatrist's disclosure of plaintiff's alleged lesbian relationship created unfair prejudice). The trial court, moreover, overruled repeated efforts to exclude this aspect of the alleged affair without any explanation or analysis of the relevant factors under V.R.E. 403. We conclude, accordingly, that the admission of such evidence was an abuse of discretion.

As noted, the defense also adduced evidence that decedent had provided his four adult daughters with minimal financial or emotional support. It was established through cross-examination, for example, that decedent was not involved to any extent in their schooling or other aspects of their lives, and the daughters for their part acknowledged that they had not visited decedent when he was hospitalized for suicide and depression. Such evidence was plainly relevant to the quality of the father-daughter relationship

and the claim for loss of companionship and society. See *Mobbs*, 150 Vt. at 316, 553 A.2d at 1095.

The defense also focused intense scrutiny upon the daughters' difficult teenage years, noting their multiple pregnancies by different fathers, failure to complete high school, and marital problems. Defendants claimed that the evidence was relevant to demonstrate decedent's failure to offer firm guidance and "moral training" to his children. See *id.* Whatever its relevance, however, the primary effect of such evidence was to malign the moral standing of decedent's daughters. It placed *their* character, rather than their relationship with decedent, on trial. As such, any probative value that inhered in the evidence was substantially outweighed by its powerful tendency to create unfair prejudice against plaintiff. See *Gamble v. Hill*, 156 S.E.2d 888, 894 (Va. 1967) (evidence in wrongful death action that sixteen-year-old decedent was single mother and was pregnant when killed was inadmissible to demonstrate rift between decedent and plaintiff-parents); *Strelecki*, 276 N.W.2d at 801 (unwed daughter's pregnancy inadmissible in wrongful death action to demonstrate decedent's poor relationship with family). As the Virginia Supreme Court observed in *Gamble*, such evidence has a strong tendency "to induce the jury to equate a just award to [plaintiffs] with the [daughter's] moral delinquencies." 156 S.E.2d at 894. Accordingly, we hold that the trial court abused its discretion in admitting such evidence.

The question remains whether the court's errors warrant reversal of the judgment and a new trial. We conclude that they do. Although the erroneously admitted evidence went to damages, not liability, the verdict in this regard was close, with forty percent of the fault attributed to defendants. In these circumstances, the erroneously admitted evidence had substantial potential for influencing the jury. See *John A. Russell Corp. v. Bohlig*, 170 Vt. 12, 23, 739 A.2d 1212, 1221 (1999) (reversal of judgment required where erroneous admission of character evidence "had substantial potential for influencing the jury"). Accordingly, we cannot conclude that the errors were harmless. The judgment must, therefore, be reversed, and the case remanded for a new trial.

*Reversed and remanded for a new trial.*

Motion for reargument denied January 10, 2001.