NOTICE:  This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports.  Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 14

No. 2014-296

| | |
|---|---|
| In re Estate of Dezotell | Supreme Court |
| | On Appeal from<br>Superior Court, Orleans Unit,<br>Civil Division |
| | April Term, 2015 |

Howard E. Van Benthuysen, J.

Jennifer DeForge, Renee Dezotelle, Beverly Sanborn, Sammie-Jo Lackie, Nicole Sevigny and Melissan Dezotelle, Pro Ses, Montpelier, Appellants.

Andrew D. Manitsky of Gravel & Shea PC, Burlington, for Appellee.

Maria Dezotell, Pro Se, Keeseville, New York, Appellee.

PRESENT:  Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.


¶ 1.  **REIBER, C.J.**  The questions presented are whether, in distributing the proceeds of a wrongful-death settlement to the decedent's spouse and children, the trial court was bound by the provisions of an earlier settlement distribution, and, if not, whether the court erred in curtailing an evidentiary hearing to divide the settlement in proportion to the pecuniary injuries suffered.  We hold that that the trial court correctly concluded that it was not bound by the prior order, but erred in limiting the evidentiary hearing.  Accordingly, we reverse and remand.

¶ 2.  The undisputed facts and procedural history may be summarized as follows.  Decedent Lyman Dezotell was killed in an automobile accident in November 2001.  At the time

of his death, decedent had been married for about eight months to Maria Dezotell. Decedent had met Maria online, traveled to Romania where she lived, spent about a month there, and ultimately married her in March 2001. Maria was pregnant with the couple's first child when decedent was killed. The child, Roger Dezotell, was born in June 2002.[1]

¶ 3. Decedent had six daughters at the time of his death. Four were from an earlier marriage to Linda Bedard that ended in divorce: Renee, who was twenty years old; Beverly, who was nineteen, Sammie-Jo, then sixteen, and Nicole, who was fifteen. One daughter, Jennifer, then almost twenty-three, had been adopted. The sixth daughter, Melissan, then eight years old, was from a three-year relationship with Melissan's mother that ended in 1994, when Melissan was one. Melissan later lived with her mother. Decedent enjoyed regular visits with Melissan on weekends, but provided little financial support. Based on decedent's income from a fulltime job at IBM acquired about two years before his death, the trial court determined that decedent's child support obligation for Melissan would have been $590 per month.

¶ 4. Maria was appointed to serve as the administrator of the estate, and subsequently petitioned the superior court, pursuant to the provisions of 14 V.S.A. § 1492(c),[2] to distribute a combination of insurance proceeds that totaled about $135,000. Following an evidentiary hearing, the court issued a written ruling in November 2004.

¶ 5. The trial court noted that, under settled law, the "pecuniary injuries suffered" by the parties under 14 V.S.A. § 1492, were not limited to purely economic losses, but could also

---

[1] We refer to the parties by their first names solely for ease of identification.

[2] This section provides, in pertinent part, that in a wrongful death action "[t]he amount recovered" shall be for the benefit of the decedent's spouse and next of kin, that it shall be distributed by the deceased's personal representative, and that "[s]uch distribution, whether of the proceeds of a settlement or of an action, shall be in proportion to the pecuniary injuries suffered, the proportions to be determined . . . in such manner as the superior court . . . shall deem proper and after a hearing at such at such time as the court or judge may direct, upon application made by such personal representative or by the wife, husband or any next of kin." 14 V.S.A. § 1492(c).

2

include "loss of companionship . . . as well as compensation for [the] lost intellectual, moral and physical training or the loss of care, nurture and protection" provided by a parent. Mears v. Colvin, 171 Vt. 655, 657, 768 A.2d 1264, 1267 (2000) (mem.) (quotations omitted). These considerations extend to the loss suffered by an adult child, as well as a minor. See id. at 656, 768 A.2d at 1266 (plaintiffs claimed that father's loss "had deprived his next of kin—including his wife . . ., four adult daughters, and one minor child—of a close and loving relationship"). In distributing the settlement, therefore, the trial court was authorized to "consider the physical, emotional, and psychological relationship of the parties, as well as their living arrangements . . . the harmony of family relations, and the commonality of interests and activities." Id. at 657-58, 768 A.2d at 1267 (quotations omitted).

¶ 6.    In this respect, the trial court noted that decedent had been awarded sole parental rights and responsibilities for the children after his divorce; that he had performed most of the household work with some assistance from his daughters as they got older; and that through a combination of "part-time and odd jobs" he had been able to provide the "bare essentials" for himself and the children. While his means were limited, the court nevertheless found that decedent had loved each of his daughters "in his own way" and that they had returned the affection; that his daughters had "continued to seek [decedent's] advice and counsel after they left the household;" and that decedent had offered them whatever wisdom he could, urging, for example, that they complete their schooling and vocational training even if he could not assist them financially.

¶ 7.    As to his new family, the court found that, before moving to the United States from Romania in 2001, Maria had obtained the equivalent of a B.A. in chemistry, was a relatively accomplished and well-known journalist, and was fluent in English. She had worked as a para-educator in the North Country school district before decedent's death, and since then

3

had become a fulltime math and science teach at Craftsbury Academy by waiver, and was taking the necessary coursework to obtain her teacher's license.

¶ 8. Based on these findings, the court concluded that a "lump sum distribution of $2500 is fair and appropriate to each of [decedent's] adult daughters."[3] Although still minors when decedent was killed, the court included Sammi-Jo and Nicole in this distribution because Sammi-Jo was "effectively emancipated" and living without her father's support, and Nicole had departed to live with her mother. The court explained that, while none of the daughters could have realistically expected any significant financial assistance from decedent, each had a "special relationship with" decedent and had suffered "some loss of companionship and parental direction."

¶ 9. As to Melissan, who was still a minor, the court noted that decedent had a "statutory obligation to support [the] child" which he had largely ignored, while nevertheless maintaining some "meaningful parent-child contact." The court thus concluded that "the sum of $25,000 seems fair and just for Melissan." The court directed that the money be held in trust for Melissan's benefit by her mother, and that it be used only for "extraordinary expenses," with the "primary goal of conserving as much as possible of this asset for Melissan's college or other educational expenses."

¶ 10. The court awarded the balance of the settlement, almost $100,000, to "Maria Dezotell, [decedent's] surviving wife, and Roger Dezotell, the son he hoped for, but never saw." In support of this award, the court found that decedent had intended to provide them "the sort of stable household and family life he had never been able to secure before his regular employment with IBM"; that he "would have been a committed and loving father for Roger"; and that the

---

[3] The court excluded Renee from this distribution because she was the sole beneficiary of a $40,000 life insurance policy on decedent. The court also added $1000 to Beverly's award to reimburse her for a loan she had made to decedent, and $2350 to Jennifer's award to reimburse her for funeral expenses she had paid on behalf of the estate.

"the sum of close to $100,000" was a recognition of Maria's "resiliency" and an "investment in the future for Maria and Roger." On November 18, 2004, the court issued a final judgment order incorporating the monetary awards set forth in its findings. The judgment order concluded that the action was thereby "terminated."

¶ 11. Five years later, in June 2008, decedent's estate again petitioned the court for a distribution of wrongful death proceeds, this time resulting from the settlement of a lawsuit by the estate against the University of Vermont and others. The suit had alleged that the driver of the vehicle which struck and killed decedent had been participating in a UVM-sponsored experimental drug study, and that UVM was negligent in allowing him to drive. The amount available for distribution from the settlement was about $205,000.[4]

¶ 12. The petition stated that the estate beneficiaries had agreed to use the prior order as a basis for distribution, and thus receive the same proportion of the new settlement that they had received under the first. The $2500 awarded to the four daughters (Jennifer, Beverly, Sammi-Jo, and Nicole) constituted 1.88% of the previous distribution; the $25,000 awarded to Melissan was 18.79%; and the balance of nearly $100,000 granted to Maria and Roger represented 73.69%. Applying these percentages to the current settlement resulted in a distribution to each of the four daughters of $3,852; to Melissan the sum of $38,504; and to Maria on behalf of Roger a total of $151,007. On August 10, 2009, the trial court issued an order approving the stipulated distribution.

¶ 13. About a year later, in August 2010, the estate's attorney in the UVM wrongful-death action filed a complaint against the estate for attorney's fees allegedly due and owing, and the estate, in response, filed a counterclaim alleging professional malpractice. The estate alleged that its attorney's negligent and unethical handling of the lawsuit had improperly influenced its

---

[4] The total settlement was for $325,000, but $100,000 was withheld pending a claim for attorney's fees by the estate's attorney and an additional $20,000 was credited against other claims on the estate.

decision to accept the settlement. The malpractice claim settled in September 2013, resulting in an additional $204,000 available to the estate for distribution.[5]

¶ 14. In January 2014, the estate filed a third petition for distribution of the additional settlement funds. The estate proposed to distribute the money using the same percentage formula as the second distribution, with one exception. The estate asserted that Melissan's earlier distributions were predicated on her status as a minor, to compensate her for the loss of child support, and that having reached the age of majority her percentage should be decreased to that of the other daughters who had received a distribution, or 1.88%, leaving about 90% to be distributed to Maria and Roger. Melissan opposed the change, asserting that the distribution formula employed in the earlier orders was res judicata.

¶ 15. In April 2014, the court ruled that it was not bound by the prior distributions in the current proceeding. The court concluded that "whatever amounts make a fair and equitable distribution are not fixed" when the wrongful death action accrued, but rather "may deviate from previous distributions as the circumstances warrant." Thus, the court ruled that "a fresh look into what would constitute a fair and equitable distribution in 2014 [was] warranted," and set the matter for "a new hearing . . . under 14 V.S.A. § 1492(c) in order to determine the division of the proceeds from the settlement."

¶ 16. On May 14, 2014, the court held an evidentiary hearing in which one of the daughters, Jennifer, testified. Jennifer described her close relationship with decedent, his tireless efforts to support the family "the best that he could," and the values of hard work and honesty that he imparted to his children which they continued to apply today. The court interjected during cross-examination of the witness that the focus should be on "things that have happened since 2004," but indicated that it would allow Jennifer to complete her testimony and "find . . .

---

[5] The gross settlement was for $382,500. Deducting attorney's fees and expenses resulted in a net to the estate of approximately $204,000.

another whole day as soon as possible—possibly giving up a trial day actually—to enable you folks to finish this case." Jennifer then testified that she hoped for a larger share of the new settlement to help support her child, who was not born at the time of the earlier proceeding, that she and her sisters were "in different chapters" of their lives, and that she still hoped to "make dad proud." When the testimony concluded, the court indicated that it needed to adjourn the hearing to address other matters but would direct court staff "to find you forthwith a day to finish."

¶ 17. Despite its statement on the record, the court issued a short order following the hearing stating that the only issue before the court was whether to alter Melissan's share, and that if "the [p]arties desire further hearing regarding altering the distribution of anyone besides Melissan, he or she must show . . . why further evidence is appropriate and . . . make an offer as to what evidence is relevant to the issues." Counsel for the daughters, including Melissan, filed a responsive memorandum arguing that Melissan's age was not the only circumstance that had changed over time or was relevant to the distribution of the new settlement. Counsel noted that Maria and Roger had already been awarded approximately $250,000 from the prior settlements while Jennifer, Sammi-Jo, Nicole and Beverly had each received less than $10,000. Counsel proposed to show that Maria did not now require the same level of support, having used the prior distributions to secure a teaching certificate and a fulltime teaching position with the Missisquoi Union High School, and had entered into a new domestic relationship. In addition to changes in Maria's life, counsel argued that evidence of the other daughters' current circumstances was also relevant, as well as simply the "amount of distributions to date." As a possible guide, counsel suggested the intestacy statute, which would result in a distribution of one-half of the new settlement to Maria, and the remainder evenly divided among the children.

¶ 18. The court issued a written ruling in July 2014. The court explained that it had concluded that further evidence was unnecessary; the original distribution order determined that

7

none of the older daughters could have "reasonably expected any financial assistance from their father" and the court found "no basis for revisiting that determination" either from Jennifer's testimony or from anything that the other daughters might add. As to Melissan, however, the court concluded that it was appropriate to reduce her share "to that of the other [d]aughters at 1.88% . . . based on the logic of the 2004 order," inasmuch as she was also now "an independent adult." Accordingly, the court awarded 1.88% of the settlement funds, or approximately $3,835, to each of decedent's daughters, and the balance of 88.72%, or about $181,000, to Maria on behalf of herself and Roger.[6] Combined with the earlier awards, this resulted in a total distribution of $432,000 to Maria and Roger; $67,339 to Melissan; about $10,000 each to Jennifer, Beverly, Nicole, and Sammi-Jo; and $3,835 to Renee. This pro se appeal by decedent's daughters followed.

¶ 19. Daughters contend the trial court was either collaterally estopped from reducing Melissan's share of the third settlement by the earlier distributions or, alternatively, that if the court was not estopped then it improperly excluded evidence relevant to the distribution "in proportion to the pecuniary injuries suffered." 14 V.S.A. § 1492(c). The collateral estoppel argument is unpersuasive. The doctrine bars the relitigation of an issue that was actually decided in a prior case. Trickett v. Ochs, 2003 VT 91, ¶ 10, 176 Vt. 89, 838 A.2d 66. It applies, in limited circumstances, when preclusion is asserted against a party to the prior action; the same issue was raised in the prior action; the issue was resolved by a final judgment on the merits; there was a full and fair opportunity to litigate the issue; and applying preclusion is fair. Id.

¶ 20. Each of the three distribution petitions filed by the estate at roughly five-year intervals presented, by definition, a separate issue for the court to determine a fair and equitable distribution of each settlement in light of the circumstances then presented. See Estate of Tilton

_____

[6] Renee also received a share, although she had not received any funds from the earlier distributions.

8

v. Lamoille Super. Ct., 148 Vt. 213, 216, 531 A.2d 919, 921 (1987) (observing that 14 V.S.A. § 1493(c) "is directed toward fair distribution of a wrongful death award among competing claimants"). The decision in each instance is necessarily contextual and forward looking. As we have explained, in determining a beneficiary's "pecuniary loss" the court must examine the "losses which the circumstances of the particular case establish with reasonable certainty will be suffered by the beneficiary . . . in the future." Mobbs v. Central Vt. Ry., 150 Vt. 311, 316, 553 A.2d 1092, 1096 (1988) (quotation omitted); see also D'Angelo v. Rutland Ry., Light & Power Co., 100 Vt. 135, 135 A. 598 (1927) (approving rule that next of kin may recover for wrongful death the "loss of her reasonable expectation of pecuniary advantage from the continuance of the life of the deceased"); see generally S. Speiser et al., Recovery for Wrongful Death § 6:10 (4th ed. 2015) ("[T]he loss of support for which damages are to be recovered is necessarily a loss in the future, and therefore the verdict can be nothing other than a prediction as to the reasonable probabilities.").

¶ 21. Successive distributions—even in the same case—may reflect entirely different "equities" and "expectations" depending upon the ages of the beneficiaries at the time, their economic circumstances and needs, previous awards received, and the amount available for distribution. See, e.g., In re Estate of Figley, No. 12 00 15, 2013 WL 500775, at **3-4 (Ohio Ct. App. 2013) (rejecting claim that court erred in finding that it was "fair and equitable to distribute the proceeds of the Second Settlement equally among the [decedent's] three sisters" despite their waiver of any interest in the first settlement, considering their loss of companionship and the total of the two settlements considered "as a whole"); In re Estate of Cochran, No. A2000-05-030, 2001 WL 273644, at **2-3 (Ohio Ct. App. 2001) (rejecting claim that "trial court abused its discretion by deviating from the percentage distributions it made of . . . prior settlement proceeds" and noting that the court in each case must be guided by "the evidence before it and apportion the settlement accordingly"). The trial court here was correct, therefore, in concluding

9

that a fair apportionment of the third settlement should be measured, in part, by the parties' current circumstances. This was reflected in its decision to reduce Melissan's percentage based on the fact that she was no longer a minor.

¶ 22. Nevertheless, we conclude that the trial court erred in failing to apply this principle consistently to the other beneficiaries or the proceeding as a whole. While initially stating its intention to schedule an additional hearing day, the court subsequently reconsidered the matter and ultimately ruled that further evidence of the daughters' circumstances was unnecessary. In so ruling, the court explained that it would not "revisit[]" the 2004 finding that the daughters could not have reasonably expected much financial assistance from their father, and that further evidence would not add anything of substance.

¶ 23. The court's ruling overlooks the fact that this original finding was made in the specific context of a specific settlement ten years earlier. At the time, the court was attempting to divide a limited fund of approximately $135,000 among eight beneficiaries, including two children who were three and eleven years old. Since then, the estate had received an additional $200,000—the bulk of which had been awarded to Maria and Roger—the three year old had become a teenager, and the eleven-year-old was now a young adult seeking, like her older sisters, some additional measure of financial security. All of these additional circumstances, and possibly others—including evidence that Maria and Roger had already received $250,000, that Maria was now financially secure, that Roger was substantially closer to the age of majority, and that the daughters themselves may have new families and obligations and aspirations—were potentially relevant to the fair and equitable distribution of the additional $204,000 settlement. Although the finding that decedent—while he was alive—had never been able to provide a great deal for his daughters in material terms certainly remained true, it did not compel the conclusion that 1.88% of the third settlement was all they could ever reasonably expect, or all that decedent would ever want them to have, upon his death.

10

¶ 24.   With respect, the dissenting opinion is incorrect in asserting that we "ignore[]" the plain language of the statute" in concluding that the trial court was not bound by the initial distribution from 2004 in reaching a fair and equitable division of the malpractice settlement ten years later.  Post, ¶ 35.  Although the dissent declares that the ratios from the initial distribution are binding in the distribution of all subsequent settlement proceeds, it cites no statutory language or case law dictating this result.  Furthermore, while the dissent is correct in noting that the wrongful-death statute does not expressly instruct the court to make a "fair and equitable" distribution of the wrongful death proceeds, this Court has observed that the statute contemplates a "fair distribution of a wrongful death award among competing claimants," Estate of Tilton, 148 Vt. at 216, 531 A.2d at 921, and the dissent has identified no case law or other authority contradicting the common-sense conclusion that fairness may dictate a different distribution a decade after the initial settlement.

¶ 25.   We conclude, accordingly, that the trial court erred in restricting the daughters' introduction of additional evidence relevant to the distribution of the third settlement in proportion to the injuries from their loss, and therefore remand the matter for further proceedings.

Reversed and remanded for further proceedings consistent with the views expressed herein.

FOR THE COURT:

_____
Chief Justice

¶ 26.   **ROBINSON, J., dissenting.**  Under Vermont's statute governing wrongful death actions, damages are determined "with reference to the pecuniary injuries" of the surviving spouse and next of kin, and are distributed among them in proportion to their respective injuries.

11

14 V.S.A. § 1492(b). The determination of the wrongful-death-act beneficiaries' pecuniary injuries is ultimately one of fact. For that reason, when a court adjudicates the amount of the damages awardable to the personal representative of the beneficiaries on account of a wrongful death, or the relative proportion of those damages to be allocated to each of the respective statutory beneficiaries, that determination is an adjudicated fact that has preclusive effect in subsequent actions when the criteria for collateral estoppel are satisfied. In this case, those criteria are satisfied, and the 2004 order adjudicating the relative proportion of the statutory beneficiaries' pecuniary damages has preclusive effect in subsequent proceedings in which the relative proportion of the statutory beneficiaries' pecuniary damages is at issue. In asserting that the wrongful death statute requires a "fair and equitable distribution," ante ¶ 20, of each wrongful death settlement in light of the circumstances then presented, the majority adopts a framework that is at odds with the wrongful death statute and our cases, and embraces a holding that creates significant practical problems. For these reasons, I dissent. The plain language of the wrongful death statute, and our case law applying that statute, make it clear that the damages that can be awarded in a wrongful death case are determined with reference to the pecuniary injuries of the surviving spouse and next of kin, that the proceeds of a wrongful death action are distributed among statutory beneficiaries in proportion to their respective injuries, and that the factors driving the calculation of wrongful death damages and the distribution of wrongful death proceeds are one and the same.

¶ 27. The wrongful death statute provides that the court or jury before whom a wrongful death case is tried "may give such damages as are just, with reference to the pecuniary injuries resulting from such death, to the [spouse] and next of kin." 14 V.S.A. § 1492(b). The personal representative is required to distribute the proceeds "in proportion to the pecuniary injuries suffered, the proportions to be determined upon notice to all interested persons in such manner as the superior court . . . shall deem proper and after a hearing." Id. § 1492(c); see

Bassett v. Vt. Tax Dep't, 135 Vt. 257, 259, 376 A.2d 731, 733 (1977) ("Clearly, under the statute, distribution is to be in direct proportion to pecuniary injuries suffered from the wrongful death, a factor not considered in distribution of ordinary estate assets."). The statute is not ambiguous on this point and should be construed consistent with its plain meaning. See In re Willey, 2010 VT 93, ¶¶ 11-12, 189 Vt. 536, 14 A.3d 954 (denying trial court power under 14 V.S.A. § 1492(c) to control how wrongful death proceeds were invested because the "plain meaning" of the statute allowed trial court to determine only how the proceeds were distributed); Mier v. Boyer, 124 Vt. 12, 13, 196 A.2d 501, 502 (1963) ("[W]here the meaning of a statute is plain, the courts must enforce it according to its terms." (citation omitted)).

¶ 28. Nearly a century ago, this Court explained that in determining wrongful death damages, the factfinder should determine "what amount is a just compensation for the financial loss which the evidence shows will probably be directly or proximately caused by the death of the victim." D'Angelo v. Rutland Ry. Light & Power Co., 100 Vt. 135, 138, 135 A. 598, 599 (1927) (quoting Bond v. United R.Rs., 113 P. 366, 369 (Cal. 1911)). Although the statute speaks of "pecuniary," or financial loss, this Court has long held that such loss encompasses intangibles such as the "loss of intellectual and moral training and proper nurture by a child, and loss of her husband's care and protection by a widow." Lazelle v. Town of Newfane, 70 Vt. 440, 445, 41 A.511, 512 (1898) (quotation omitted). We reiterated this understanding of the wrongful death statute more recently, explaining, "[t]he term 'pecuniary injuries' does not limit recovery to purely economic losses. In cases where it has been construed by this Court, the term has been held to contemplate compensation for lost intellectual, moral and physical training, or the loss of care, nurture and protection." Mobbs v. Cent. Vt. Ry., 150 Vt. 311, 316, 553 A.2d 1092, 1095 (1988); see also Clymer v. Webster, 156 Vt. 614, 629-30, 596 A.2d 905, 914 (1991) (concluding that damages under the wrongful death act can include damages suffered by parents of an adult child resulting from the loss "of the society of that child"). Accordingly, in calculating wrongful

13

death damages, the factfinder "may consider the physical, emotional, and psychological relationship of the parties, as well as their living arrangements, . . . the harmony of family relations, and the commonality of interests and activities." Mears v. Colvin, 171 Vt. 655, 657-58, 768 A.2d 1264, 1267 (2000) (mem.) (citing Clymer, 156 Vt. at 630, 596 A.2d at 914) (quotations omitted).

¶ 29.    The connection between the determination of wrongful death damages in the first instance and the distribution among statutory beneficiaries of sums recovered in a wrongful death case is critical to the analysis in this case. See In re Estate of Cote, 2004 VT 17, ¶10, 176 Vt. 293, 848 A.2d 264 ("All relevant parts of the applicable statutory scheme are to be construed together to create, if possible, a harmonious whole." (citation omitted)). At common law, all actions for personal injuries died with the person injured, so that a surviving spouse or next of kin had no recourse for losses they suffered when a spouse, parent, or child died as the result of another's wrongful act. Lazelle, 70 Vt. at 443-44, 41 A. at 511-12. Wrongful death damages are recoverable by a surviving spouse or next of kin solely by force of statute, and are both driven and limited by the individual and cumulative pecuniary losses sustained by these statutory beneficiaries. Id. No other factor beyond the pecuniary damages suffered by the beneficiaries can support an award of wrongful death damages; the total damages that can be awarded to the personal representative of the beneficiaries is the sum of the individual beneficiaries' own respective pecuniary damages. The proceeds that are actually recovered in a wrongful death action—whether they are equal to or are less than the sum of the beneficiaries' respective pecuniary damage—are likewise divided among those beneficiaries in proportion to their respective shares of the cumulative damages. In short, the assessment that drives the availability and limit of damages in a wrongful death case also drives the distribution of wrongful death proceeds among those beneficiaries.

14

¶ 30.    Accordingly, a court's determination of the relative proportions of the statutory beneficiaries' losses is as much an adjudicated fact as the court's determination of the total damages to be awarded in the first place.  Nobody would suggest that the personal representative in a wrongful death case could return to court years after the court's initial damage determination in order to seek more damages, even if intervening events had unfolded in ways that were not contemplated by the court at the time of its original damage award such that the actual losses suffered by the statutory beneficiaries were greater than anticipated at the time of the judgment.  See, e.g., Faulkner v. Caledonia Cty. Fair Ass'n, 2004 VT 123, 178 Vt. 51, 869 A.2d 103 (concluding that plaintiff's personal injury claim for damages from epilepsy resulting from head injury at fair was precluded where plaintiff had previously recovered a $5,000 verdict for head injury, before epilepsy manifested).  The Restatement (Second) of Judgments explains:

> Typically, even when the injury caused by an actionable wrong extends into the future and will be felt beyond the date of judgment, the damages awarded by the judgment are nevertheless supposed to embody the money equivalent of the entire injury. Accordingly, if a plaintiff who has recovered a judgment against a defendant in a certain amount becomes dissatisfied with [the] recovery and commences a second action to obtain increased damages, the court will hold [the plaintiff] precluded . . . It is immaterial that in trying the first action he was not in possession of enough information about the damages, past or prospective, or that the damages turned out in fact to be unexpectedly large and in excess of the judgment.

Id. § 25, cmt. c.

¶ 31.    Nor could one of the beneficiaries of a wrongful death award seek to reopen the distribution of that award among the beneficiaries on the ground that, in light of subsequent events, the court's initial assessment of the relative past and prospective pecuniary injuries of the respective beneficiaries proved to be inaccurate.  We have recognized that "damages, in their very nature, are not susceptible of exact computation."  Mobbs, 150 Vt. at 316, 553 A.2d at 1096 (quoting Johnson v. Hoisington, 134 Vt. 544, 547, 367 A.2d 680, 682 (1976)) (internal alteration

omitted).    Once the beneficiaries' respective losses—whether their collective total, the proportion among them, or both—is adjudicated by a court, that determination has the status of an adjudicated fact.

¶ 32.    Whether the court's factual determination of the relative pecuniary injuries of the beneficiaries in the context of the wrongful death action implicating various automobile insurance policies has preclusive effect with respect to the determination of the beneficiaries' proportionate injuries in connection with a distinct action against a different defendant but arising from the same wrongful death turns on ordinary principles of claim preclusion.[7]   In particular, the final judgment in previous litigation bars subsequent litigation "if the parties, subject matter, and causes of action in both matters are the same or substantially identical." Faulkner, 2004 VT 123, ¶ 8 (internal alteration omitted).

¶ 33.    In this case, the statutory beneficiaries with respect to the distribution of the wrongful death proceeds resulting from the malpractice settlement are the same as with respect to the 2004 court order distributing the automobile insurance proceeds.   The subject matter and cause of action in the two matters is the same: determination of the beneficiaries' relative pecuniary injuries as a result of decedent's death for the purposes of distributing proceeds from a wrongful death action pursuant to 14 V.S.A. § 1492(c).  It's hard to imagine a closer identity of parties, subject matter and causes of action between the adjudicated distribution of the proceeds of a wrongful death settlement with various automobile insurance carriers and the distribution of wrongful death proceeds at issue here.  Although in this case, on account of multiple settlements with different tortfeasors, funds were recovered in several installments to apply toward the

_____

[7]  The claim at issue in this appeal was against the estate's attorney.  But the damages in that malpractice case were calculated based on the damages that should have been collected from the University of Vermont and others in connection with the wrongful death claim against the University of Vermont (UVM) and others.  For the purposes of this analysis, I accordingly treat the proceeds as proceeds from the wrongful death claim against UVM and others even though the third claim was actually a malpractice claim.

16

beneficiaries' respective and collective pecuniary injuries, the relative proportions of those injuries were established in the first proceeding. Issue preclusion applies, and the parties are bound by the court's 2004 determination of the beneficiaries' relative pecuniary injuries.[8]

¶ 34. In reaching a different conclusion, the majority adopts a framework that is at odds with the plain language and structure of the wrongful death statute, as well as our prior case law. Its framework would invite relitigation of wrongful death distributions and inconsistent rulings, undermining the finality of judgments in wrongful death cases.

¶ 35. The majority's assertion that each of the distribution petitions filed by the estate in this case presented "a separate issue for the court to determine a fair and equitable distribution of each settlement in light of the circumstances then presented," ante ¶ 20, completely ignores the plain language of the statute. The relevant subsection of the wrongful death statute does not instruct the court to make a "fair and equitable distribution" of wrongful death proceeds; neither term even appears in the statute. See McAllister v. AVEMCO Ins. Co., 148 Vt. 110, 112, 528 A.2d 758, 759 (1987) (explaining that Court will expand plain meaning of statute by implication only when necessary to make the statute effective). Rather, the wrongful death statute requires the court to distribute the proceeds "in proportion to the pecuniary injuries suffered" by the respective beneficiaries. 14 V.S.A. § 1492(c); see Mier, 124 Vt. at 13, 196 A.2d at 502; accord JW, LLC v. Ayer, 2014 VT 71, 197 Vt. 118, 101 A.3d 396 ("[W]here [statutory] language is unambiguous" court construes according to "statute's plain meaning"). As noted above, this is a factual determination requiring the court to ascertain each beneficiary's losses, and then determine the ratios between them. It is not a free-floating admonition to do what's fair.

---

[8] Because each of the claims against the respective tortfeasors was resolved by settlement, the court was never called upon to determine the beneficiaries' total individual or collective pecuniary injuries; it only had to determine the relative proportions of the beneficiaries' injuries. Whether a court's determination of the total pecuniary injury suffered by an individual or the group would have preclusive effect in a subsequent action against a different tortfeasor would depend upon the application of the principles of collateral estoppel in that distinct context.

17

¶ 36.   In redefining the trial court's charge as one of simply fairly dividing the proceeds of the wrongful death settlement, the majority severs the connection between the <u>calculation</u> of wrongful death damages in the first place—based on the beneficiaries' respective and cumulative pecuniary losses—and the distribution of proceeds from the wrongful death claims.  It treats the proceeds of the malpractice settlement as a pool of money available to be distributed fairly, without recognizing that the parties' respective losses both drive and limit the available damages in a wrongful death case.  In this case, as in many, the parties did not litigate the actual question of damages against any of the wrongful death defendants, because the claims against these defendants were resolved by settlement.  But the ratios between the beneficiaries' respective pecuniary injuries are no more fluid through time than the total wrongful death damages that flow from those pecuniary injuries.

¶ 37.   Nothing in our case law supports the majority's recharacterization of the role of the factfinder in distributing wrongful death proceeds.  The majority cites <u>Estate of Tilton v. Lamoille Superior Court</u>, 148 Vt. 213, 216, 531 A.2d 919, 921 (1987) for the observation that 14 V.S.A. § 1492(c) "is directed toward fair distribution of a wrongful death award among competing claimants."  In making the leap from this observation concerning the <u>goal</u> of the wrongful death statute to its assertion that the statute empowers the court to make distinct equitable allocations of wrongful death proceeds each time a new infusion becomes available, the majority conflates the underlying purpose of the statute with the standard the Legislature has adopted to promote that goal: the relative proportion of each beneficiary's pecuniary injury.

¶ 38.   Because Vermont's statute predicates the distribution of wrongful death proceeds on a specific factual finding that has preclusive effect, the majority's reliance on two cases from Ohio is misplaced.  <u>Ante</u>, ¶ 21.  The Ohio statute governing distribution of wrongful death proceeds in the cases relied upon by the majority authorizes the court to distribute proceeds "in a manner that is equitable, having due regard for the injury and loss to each beneficiary resulting

18

from the death and for the age and condition of the beneficiaries." Ohio Rev. Code § 2125.03(A)(1). Although the beneficiaries' respective losses are a recognized factor in the calculus, they are not the only factor identified in the statute. Moreover, although the statute identifies factors to which the court must give "due regard," it ultimately gives the court broad discretion to divide the proceeds in a way that is equitable. For that reason, the Ohio wrongful death statute is completely different from Vermont's with respect to whether a distribution of wrongful death proceeds is a general equitable determination based on the circumstances before the court at a given time, without regard to past rulings.

¶ 39. My concern that the majority's approach is unfaithful to the requirements of Vermont's wrongful death statute is not just a technical one; I believe the majority has opened the door to a host of practical problems. If the majority means what it says, then every time an individual dies as a result of wrongful acts of multiple tortfeasors, and every time claims against a single tortfeasor are satisfied through successive judgments or settlements with different insurers, disputatious beneficiaries will be entitled to their day in court to establish their claims to a share of this particular infusion of wrongful death proceeds. Although the passage of time between the court's initial distribution order in this case and the distribution petition at issue in this appeal has been significant, there is nothing about the court's reasoning that limits its holding to that factual circumstance. Even if the wrongful death settlements were only two years apart, or six months apart for that matter, any beneficiary—including one dissatisfied with the last distribution order—would be entitled to insist on a new hearing and a new adjudication of the most equitable allocation of this settlement. They would be allowed to marshal new and different evidence each time the personal representative filed a petition to distribute wrongful death proceeds. And there would be nothing to guard against multiple inconsistent rulings, since each distribution would rise or fall on its own merits.

19

¶ 40. For all of these reasons, I part ways with the majority's analysis, and its decision to remand this case to the trial court. I would treat the proportional distribution reflected in the 2004 order as preclusive, and would distribute the current proceeds in the same proportion.

_____

Associate Justice