Reiber, C.J.
¶ 1. The questions presented are whether, in distributing the proceeds of a wrongful-death settlement to the decedent’s spouse and children, the trial court was bound by the *270 provisions of an earlier settlement distribution, and, if not, whether the court erred in curtailing an evidentiary hearing to divide the settlement in proportion to the pecuniary injuries suffered. We hold that the trial court correctly concluded that it was not bound by the prior order, but erred in limiting the evidentiary hearing. Accordingly, we reverse and remand.
¶ 2. The undisputed facts and procedural history may be summarized as follows. Decedent Lyman Dezotell was killed in an automobile accident in November 2001. At the time of his death, decedent had been married for about eight months to Maria Dezotell. Decedent had met Maria online, traveled to Romania where she lived, spent about a month there, and ultimately married her in March 2001. Maria was pregnant with the couple’s first child when decedent was killed. The child, Roger Dezotell, was born in June 2002.[1]
¶ 3. Decedent had six daughters at the time of his death. Four were from an earlier marriage to Linda Bedard that ended in divorce: Renee, who was twenty years old; Beverly, who was nineteen, Sammie-Jo, then sixteen, and Nicole, who was fifteen. One daughter, Jennifer, then almost twenty-three, had been adopted. The sixth daughter, Melissan, then eight years old, was from a three-year relationship with Melissan’s mother that ended in 1994, when Melissan was one. Melissan later lived with her mother. Decedent enjoyed regular visits with Melissan on weekends, but provided little financial support. Based on decedent’s income from a fulltime job at IBM acquired about two years before his death, the trial court determined that decedent’s child support obligation for Melissan would have been $590 per month.
¶ 4. Maria was appointed to serve as the administrator of the estate, and subsequently petitioned the superior court, pursuant to the provisions of 14 V.S.A. § 1492(c),[2] to distribute a combination *271 of insurance proceeds that totaled about $135,000. Following an evidentiary hearing, the court issued a written ruling in November 2004.
¶ 5. The trial court noted that, under settled law, the “pecuniary injuries suffered” by the parties under 14 V.S.A. § 1492 were not limited to purely economic losses, but could also include “loss of companionship ... as well as compensation for [the] lost intellectual, moral and physical training, or the loss of care, nurture and protection” provided by a parent. Mears v. Colvin, 171 Vt. 655, 657, 768 A.2d 1264, 1267 (2000) (mem.) (quotations omitted). These considerations extend to the loss suffered by an adult child, as well as a minor. See id. at 656, 768 A.2d at 1266 (plaintiffs claimed that father’s loss “had deprived his next of kin — including his wife . . . , four adult daughters and one minor child — of a close and loving relationship”). In distributing the settlement, therefore, the trial court was authorized to “consider the physical, emotional, and psychological relationship of the parties, as well as their living arrangements . . . , the harmony of family relations, and the commonality of interests and activities.” Id. at 657-58, 768 A.2d at 1267 (quotations omitted).
¶ 6. In this respect, the trial court noted that decedent had been awarded sole parental rights and responsibilities for the children after his divorce; that he had performed most of the household work with some assistance from his daughters as they got older; and that through a combination of “part-time and odd jobs” he had been able to provide the “bare essentials” for himself and the children. While his means were limited, the court nevertheless found that decedent had loved each of his daughters “in his own way” and that they had returned the affection; that his daughters had “continued to seek [decedent’s] advice and counsel after they left the household”; and that decedent had offered them whatever wisdom he could, urging, for example, that they complete their schooling and vocational training even if he could not assist them financially.
¶ 7. As to his new family, the court found that, before moving to the United States from Romania in 2001, Maria had obtained the equivalent of a B.A. in chemistry, was a relatively accomplished and well-known journalist, and was fluent in English. She had worked as a para-educator in the North Country school district before decedent’s death, and since then had become a *272 fulltime math and science teacher at Craftsbury Academy by waiver, and was taking the necessary coursework to obtain her teacher’s license.
¶ 8. Based on these findings, the court concluded that a “lump sum distribution of $2500 is fair and appropriate to each of [decedent’s] adult daughters.”[3] Although still minors when decedent was killed, the court included Sammi-Jo and Nicole in this distribution because Sammi-Jo was “effectively emancipated” and living without her father’s support, and Nicole had departed to live with her mother. The court explained that, while none of the daughters could have realistically expected any significant financial assistance from decedent, each had a “special relationship with” decedent and had suffered “some loss of companionship and parental direction.”
¶ 9. As to Melissan, who was still a minor, the court noted that decedent had a “statutory obligation to support [the] child” which he had largely ignored, while nevertheless maintaining some “meaningful parent-child contact.” The court thus concluded that “the sum of $25,000 seems fair and just for Melissan.” The court directed that the money be held in trust for Melissan’s benefit by her mother, and that it be used only for “extraordinary expenses,” with the “primary goal of conserving as much as possible of this asset for Melissan’s college or other educational expenses.”
¶ 10. The court awarded the balance of the settlement, almost $100,000, to “Maria Dezotell, [decedent’s] surviving wife, and Roger Dezotell, the son he hoped for, but never saw.” In support of this award, the court found that decedent had intended to provide them “the sort of stable household and family life he had never been able to secure before his regular employment with IBM”; that he “would have been a committed and loving father for Roger”; and that “the sum of close to $100,000” was a recognition of Maria’s “resiliency” and an “investment in the future for Maria and Roger.” On November 18, 2004, the court issued a final judgment order incorporating the monetary awards set forth in its findings. The judgment order concluded that the action was thereby “terminated.”
*273 ¶ 11. Five years later, in June 2008, decedent’s estate again petitioned the court for a distribution of wrongful death proceeds, this time resulting from the settlement of a lawsuit by the estate against the University of Vermont and others. The suit had alleged that the driver of the vehicle which struck and killed decedent had been participating in a UVM-sponsored experimental drug study, and that UVM was negligent in allowing him to drive. The amount available for distribution from the settlement was about $205,000.[4]
¶ 12. The petition stated that the estate beneficiaries had agreed to use the prior order as a basis for distribution, and thus receive the same proportion of the new settlement that they had received under the first. The $2500 awarded to the four daughters (Jennifer, Beverly, Sammi-Jo, and Nicole) constituted 1.88% of the previous distribution; the $25,000 awarded to Melissan was 18.79%; and the balance of nearly $100,000 granted to Maria and Roger represented 73.69%. Applying these percentages to the current settlement resulted in a distribution to each of the four daughters of $3852; to Melissan the sum of $38,504; and to Maria on behalf of Roger a total of $151,007. On August 10, 2009, the trial court issued an order approving the stipulated distribution.
¶ 13. About a year later, in August 2010, the estate’s attorney in the UVM wrongful-death action filed a complaint against the estate for attorney’s fees allegedly due and owing, and the estate, in response, filed a counterclaim alleging professional malpractice. The estate alleged that its attorney’s negligent and unethical handling of the lawsuit had improperly influenced its decision to accept the settlement. The malpractice claim settled in September 2013, resulting in an additional $204,000 available to the estate for distribution.[5]
¶ 14. In January 2014, the estate filed a third petition for distribution of the additional settlement funds. The estate proposed to distribute the money using the same percentage formula as the second distribution, with one exception. The estate asserted that Melissan’s earlier distributions were predicated on her status as a minor, to compensate her for the loss of child support, and *274 that having reached the age of majority her percentage should be decreased to that of the other daughters who had received a distribution, or 1.88%, leaving about 90% to be distributed to Maria and Roger. Melissan opposed the change, asserting that the distribution formula employed in the earlier orders was res judicata.
¶ 15. In April 2014, the court ruled that it was not bound by the prior distributions in the current proceeding. The court concluded that “whatever amounts make a fair and equitable distribution are not fixed” when the wrongful death action accrued, but rather “may deviate from previous distributions as the circumstances warrant.” Thus, the court ruled that “a fresh look into what would constitute a fair and equitable distribution in 2014 [was] warranted,” and set the matter for “a new hearing . . . under 14 V.S.A. § 1492(c) in order to determine the division of the proceeds from the settlement.”
¶ 16. On May 14, 2014, the court held an evidentiary hearing in which one of the daughters, Jennifer, testified. Jennifer described her close relationship with decedent, his tireless efforts to support the family “the best that he could,” and the values of hard work and honesty that he imparted to his children which they continued to apply today. The court interjected during cross-examination of the witness that the focus should be on “things that have happened since 2004,” but indicated that it would allow Jennifer to complete her testimony and “find . . . another whole day as soon as possible — possibly giving up a trial day actually — to enable you folks to finish this case.” Jennifer then testified that she hoped for a larger share of the new settlement to help support her child, who was not born at the time of the earlier proceeding, that she and her sisters were “in different chapters” of their lives, and that she still hoped to “make dad proud.” When the testimony concluded, the court indicated that it needed to adjourn the hearing to address other matters but would direct court staff “to find you forthwith a day to finish.”
¶ 17. Despite its statement on the record, the court issued a short order following the hearing stating that the only issue before the court was whether to alter Melissan’s share, and that if “the [pjarties desire further hearing regarding altering the distribution of anyone besides Melissan, he or she must show . . . why further evidence is appropriate and . . . make an offer as to what evidence is relevant to the issues.” Counsel for the daugh *275 ters, including Melissan, filed a responsive memorandum arguing that Melissan’s age was not the only circumstance that had changed over time or was relevant to the distribution of the new settlement. Counsel noted that Maria and Roger had already been awarded approximately $250,000 from the prior settlements while Jennifer, Sammi-Jo, Nicole and Beverly had each received less than $10,000. Counsel proposed to show that Maria did not now require the same level of support, having used the prior distributions to secure a teaching certificate and a fulltime teaching position with the Missisquoi Union High School, and had entered into a new domestic relationship. In addition to changes in Maria’s life, counsel argued that evidence of the other daughters’ current circumstances was also relevant, as well as simply the “amount of distributions to date.” As a possible guide, counsel suggested the intestacy statute, which would result in a distribution of one-half of the new settlement to Maria, and the remainder evenly divided among the children.
¶ 18. The court issued a written ruling in July 2014. The court explained that it had concluded that further evidence was unnecessary; the original distribution order determined that none of the older daughters could have “reasonably expected any financial assistance from their father” and the court found “no basis for revisiting that determination” either from Jennifer’s testimony or from anything that the other daughters might add. As to Melissan, however, the court concluded that it was appropriate to reduce her share “to that of the other [daughters at 1.88% . . . based on the logic of the 2004 order,” inasmuch as she was also now “an independent adult.” Accordingly, the court awarded 1.88% of the settlement funds, or approximately $3835, to each of decedent’s daughters, and the balance of 88.72%, or about $181,000, to Maria on behalf of herself and Roger.[6] Combined with the earlier awards, this resulted in a total distribution of $432,000 to Maria and Roger; $67,339 to Melissan; about $10,000 each to Jennifer, Beverly, Nicole, and Sammi-Jo; and $3835 to Renee. This pro se appeal by decedent’s daughters followed.
¶ 19. Daughters contend the trial court was either collaterally estopped from reducing Melissan’s share of the third settlement by the earlier distributions or, alternatively, that if the court *276 was not estopped then it improperly excluded evidence relevant to the distribution “in proportion to the pecuniary injuries suffered.” 14 V.S.A. § 1492(c). The collateral estoppel argument is unpersuasive. The doctrine bars the relitigation of an issue that was actually decided in a prior case. Trickett v. Ochs, 2003 VT 91, ¶ 10, 176 Vt. 89, 838 A.2d 66. It applies, in limited circumstances, when preclusion is asserted against a party to the prior action; the same issue was raised in the prior action; the issue was resolved by a final judgment on the merits; there was a full and fair opportunity to litigate the issue; and applying preclusion is fair. Id.
¶ 20. Each of the three distribution petitions filed by the estate at roughly five-year intervals presented, by definition, a separate issue for the court to determine a fair and equitable distribution of each settlement in light of the circumstances then presented. See Estate of Tilton v. Lamoille Super. Ct., 148 Vt. 213, 216, 531 A.2d 919, 921 (1987) (observing that 14 V.S.A. § 1492(c) “is directed toward fair distribution of a wrongful death award among competing claimants”). The decision in each instance is necessarily contextual and forward looking. As we have explained, in determining a beneficiary’s “pecuniary loss” the court must examine the “losses which the circumstances of the particular case establish with reasonable certainty will be suffered by the beneficiary ... in the future.” Mobbs v. Central Vt. Ry., 150 Vt. 311, 316, 553 A.2d 1092, 1096 (1988) (quotation omitted); see also D’Angelo v. Rutland Ry. Light & Power Co., 100 Vt. 135, 136, 135 A. 598, 598 (1927) (approving rule that next of kin may recover for wrongful death the “loss of her reasonable expectation of pecuniary advantage from the continuance of the life of the deceased”); see generally S. Speiser et ah, Recovery for Wrongful Death § 6:10 (4th ed. 2015) (“[T]he loss of support for which damages are to be recovered is necessarily a loss in the future, and therefore the verdict can be nothing other than a prediction as to the reasonable probabilities.”).
¶ 21. Successive distributions — even in the same case — may reflect entirely different “equities” and “expectations” depending upon the ages of the beneficiaries at the time, their economic circumstances and needs, previous awards received, and the amount available for distribution. See, e.g., In re Estate of Figley, No. 12 C0 15, 2013 WL 500775, at *3-4 (Ohio Ct. App. *277 2013) (rejecting claim that court erred in finding that it was “fair and equitable to distribute the proceeds of the Second Settlement equally among the [decedent’s] three sisters” despite their waiver of any interest in the first settlement, considering their loss of companionship and the total of the two settlements considered “as a whole”); In re Estate of Cochran, No. CA2000-05-030, 2001 WL 273644, at *2-3 (Ohio Ct. App. 2001) (rejecting claim that “trial court abused its discretion by deviating from the percentage distributions it made of . . . prior settlement proceeds” and noting that the court in each case must be guided by “the evidence before it and apportion the settlement accordingly”). The trial court here was correct, therefore, in concluding that a fair apportionment of the third settlement should be measured, in part, by the parties’ current circumstances. This was reflected in its decision to reduce Melissan’s percentage based on the fact that she was no longer a minor.
¶ 22. Nevertheless, we conclude that the trial court erred in failing to apply this principle consistently to the other beneficiaries or the proceeding as a whole. While initially stating its intention to schedule an additional hearing day, the court subsequently reconsidered the matter and ultimately ruled that further evidence of the daughters’ circumstances was unnecessary. In so ruling, the court explained that it would not “revisit[ ]” the 2004 finding that the daughters could not have reasonably expected much financial assistance from their father, and that further evidence would not add anything of substance.
¶ 23. The court’s ruling overlooks the fact that this original finding was made in the specific context of a specific settlement ten years earlier. At the time, the court was attempting to divide a limited fund of approximately $135,000 among eight beneficiaries, including two children who were three and eleven years old. Since then, the estate had received an additional $200,000 — the bulk of which had been awarded to Maria and Roger — the three year old had become a teenager, and the eleven-year-old was now a young adult seeking, like her older sisters, some additional measure of financial security. All of these additional circumstances, and possibly others — including evidence that Maria and Roger had already received $250,000, that Maria was now financially secure, that Roger was substantially closer to the age of majority, and that the daughters themselves may have new families and obligations and aspirations — were potentially relevant to the fair *278 and equitable distribution of the additional $204,000 settlement. Although the finding that decedent — while he was alive — had never been able to provide a great deal for his daughters in material terms certainly remained true, it did not compel the conclusion that 1.88% of the third settlement was all they could ever reasonably expect, or all that decedent would ever want them to have, upon his death.
¶ 24. With respect, the dissenting opinion is incorrect in asserting that we “ignore! ] the plain language of the statute” in concluding that the trial court was not bound by the initial distribution from 2004 in reaching a fair and equitable division of the malpractice settlement ten years later. Post, ¶ 35. Although the dissent declares that the ratios from the initial distribution are binding in the distribution of all subsequent settlement proceeds, it cites no statutory language or case law dictating this result. Furthermore, while the dissent is correct in noting that the wrongful-death statute does not expressly instruct the court to make a “fair and equitable” distribution of the wrongful death proceeds, this Court has observed that the statute contemplates a “fair distribution of a wrongful death award among competing claimants,” Estate of Tilton, 148 Vt. at 216, 531 A.2d at 921, and the dissent has identified no case law or other authority contradicting the common-sense conclusion that fairness may dictate a different distribution a decade after the initial settlement.
¶ 25. We conclude, accordingly, that the trial court erred in restricting the daughters’ introduction of additional evidence relevant to the distribution of the third settlement in proportion to the injuries from their loss, and therefore remand the matter for further proceedings.

Reversed and remanded, for further proceedings consistent with the views expressed herein.

 We refer to the parties by their first names solely for ease of identification.

 This section provides, in pertinent part, that in a wrongful death action “[t]he amount recovered” shall be for the benefit of the decedent’s spouse and next of kin, that it shall be distributed by the deceased’s personal representative, and that “[s]uch distribution, whether of the proceeds of a settlement or of an action, shall be in proportion to the pecuniary injuries suffered, the proportions to be determined ... in such manner as the superior court . . . shall deem proper and after a hearing at such time as such court or judge may direct, upon application made by such personal representative or by the wife, husband or any next of kin.” 14 V.S.A. § 1492(c).

 The court excluded Renee from this distribution because she was the sole beneficiary of a $40,000 life insurance policy on decedent. The court also added $1000 to Beverly’s award to reimburse her for a loan she had made to decedent, and $2350 to Jennifer’s award to reimburse her for funeral expenses she had paid on behalf of the estate.

 The total settlement was for $325,000, but $100,000 was withheld pending a claim for attorney’s fees by the estate’s attorney and an additional $20,000 was credited against other claims on the estate.

 The gross settlement was for $382,500. Deducting attorney’s fees and expenses resulted in a net to the estate of approximately $204,000.

 Renee also received a share, although she had not received any funds from the earlier distributions.